The STATE of Texas, Petitioner,

v.

Frank K. MEYER et ux., Respondents.

No. A–10937.

Supreme Court of Texas.

May 18, 1966.

Rehearing Denied June 22, 1966.

Waggoner Carr, Atty. Gen., Austin, Carroll R. Graham and Aden L. Vickers, Asst. Attys. Gen., for petitioner.

Vinson, Elkins, Weems & Searls, F. Russell Kendall, M. C. Chiles and Jarrel D. McDaniel, Houston, for respondents.

SMITH, Justice.

This is a condemnation proceeding brought by the State of Texas to acquire fee simple title to a 14.9456-acre strip of land out of a 103-acre tract belonging to respondents, Frank K. Meyer and wife, Lucille R. Meyer. The award of the special commissioners in this cause was $208,192.00, from which award the respondents appealed to the county court for a jury trial. After a trial in which the respondents waived any severance damages to the remainder, the jury found the market value of the strip taken to be $1,074,199.50. Judgment was entered in favor of respondents for this amount, granting to the State the fee simple title to the land condemned exclusive of any oil, gas or sulphur thereunder. The State appealed to the Court of Civil Appeals and that Court has affirmed the judgment of the county court. 391 S.W.2d 471. We affirm the judgments of the Court of Civil Appeals and the trial court.

The 14.9456-acre strip condemned by petitioner in this proceeding is a part of a 103-acre tract owned by respondents in the southwestern part of the City of Houston, Harris County, Texas. The larger tract is bounded on the north by Beechnut Street, on the west by Post Oak Road, on the south by Brays Bayou and on the east by the City of Houston Sewage Treatment Plant. The tract condemned is the portion of the larger tract which fronts on the east side of Post Oak Road for a distance of 2,618.93 feet, and is 240 feet in depth and contains 651,030 square feet. The portion taken by the State is bounded on the east by respondents' 88-acre remainder of the original 103-acre tract. At the time of the condemnation, respondents' land abutted on Post Oak Road, which road was at that time a conventional highway with traffic proceeding in both directions past the property. It cannot be disputed that this property has a high commercial value, being on a main traffic artery of a large and growing city, and this is substantiated to a degree by the fact that it lies across the highway from the successfully developed Meyerland Shopping Center.

In the State's petition for condemnation it is pointed out that this property is required in the construction of a controlled access highway as a part of the National System of Interstate and Defense Highways in the State of Texas; that for such purpose it is necessary to acquire the fee simple title to the land taken; and that roads are to be built as a part of said controlled access highway whereby the right of ingress and egress to or from the remaining property of respondents abutting on the new highway is not to be denied. It then excluded from the taking all oil, gas and sulphur which could be removed from beneath the condemned land without going on the surface of the land to extract such minerals. The parties agree that this reserved mineral interest has no value and no effect on the market value of the land taken. In the prayer the State asked that fee title to the land be vested in it, with the sole exclusion of the reserved mineral interest.

Thereafter, before the case was called for trial in the county court, respondents admitted the power of petitioner to condemn their land and waived any claim for severance damages to their remainder. They then presented a motion in limine to the court requesting that:

"* * * the Court instruct counsel for the Plaintiff that these Defendants have waived all right to seek damages to the remainder of Defendants' land and that the sole issue involved in this cause is the market value of the 14.9456 acres of land being condemned herein and therefore counsel should be instructed to make no reference in their voir dire examination of the jury panel, in their argument or in their questions to the witnesses as to the fact that Defendants own any land adjacent and contiguous to the land being condemned, and that their sole interrogation be in regard to the market value of said 14.9456 acres being condemned and that in view of these Defendants' waiver of any right to compensation or claim for damages to the remainder of their contiguous property that Plaintiff be restricted in its interrogations, arguments, evidence, and exhibits from showing or referring to the remainder of Defendants' lands or from attempting to introduce any evidence which will have the effect of attempting to show the jury that the size of Defendants' land is just merely being reduced by the taking of said 14.9456 acres. In truth and in fact, these Defendants have waived all right to compensation with the exception that they demand and will ever pray for the market value of the said 14.9456 acres of land which are herein being condemned and which in fact has already been appropriated by Plaintiff in this cause. Such being the case, the fact that Defendants own additional land adjoining the lands being taken has no bearing, as a mat-

ter of law, upon the sole issues being tried in this cause, and the sole reason for the introduction of evidence, or reference by opposing counsel, concerning such ownership would be to prejudice the rights of Defendants to recover the market value of their land being condemned * * *."

The court in its order granting the motion in limine, after taking note of the fact that the State was not condemning the right of ingress to or egress from the property remaining and abutting on the improvements to be constructed, directed the State to refrain from revealing to the jury that the 14.9456-acre strip was only a part of a larger tract owned by respondents. The granting of this motion and the subsequent exclusion of evidence in compliance therewith are the subjects of points of error before this Court. The only information the jury received as to the use to which the condemned property was going to be put was that it was to be used for "general highway purposes." Furthermore, the trial court would not allow the State to show that the right of ingress and egress, hereinafter referred to as right of access, was not being condemned. Apparently the trial court was of the opinion that to have permitted this fact to be presented to the jury would necessarily have revealed, although perhaps indirectly, that the respondents retained land contiguous to the strip condemned, and respondents contend that such knowledge on the part of the jury would have defeated the purpose of the motion in limine and the order granting it. In making a disposition of this cause, we necessarily must determine whether the order granting the motion in limine and the rulings during the course of the trial excluding evidence in compliance with that order resulted in depriving the State of presenting a valid theory of valuation to the jury. It is our decision that under the facts of this case the order granting the motion in limine and the consequent evidentiary rulings by the trial court were proper and necessary in order to in-

sure to the landowners the fair market value of the land taken.

Petitioner's first five points of error are closely related and are briefed and argued together. These points complain of the error of the Court of Civil Appeals in affirming the trial court's action in (1) granting the motion in limine; (2, 3) excluding the opinion testimony of two of the State's expert witnesses, Legge and Dailey, as to the value of the strip taken because of factors considered and the method by which they arrived at their opinions; (4) excluding the testimony of the State's witness, Stork, the Supervising and Designing Engineer for the Texas Highway Department, as to the improvements to be constructed on the land taken; and (5) excluding the State's Exhibits Nos. 5 and 6 which were highway plans showing the nature and location of the improvements to be built on the condemned property and to the north and south along Post Oak Road. In essence it is the State's contention that since respondents, after the taking of the condemned land, still have remaining land from which they have access to the land taken, upon which has been or will be constructed a frontage or service road, there has not been a whole taking in fee simple but that instead the State has acquired a fee title burdened with an easement for which it should be entitled to pay less than for a fee simple absolute.

On voir dire examination, out of the presence of the jury, two of the State's three expert witnesses as to value, Legge and Dailey, stated unequivocally that in arriving at their opinions of the value of respondents' 14.9456 acres they considered the part taken as a part of the larger 103-acre tract and took into consideration the fact that the right of access was not being acquired by the State. Furthermore, in arriving at a per acre value for the strip taken, they averaged the values of various portions of the whole tract even though the portion of the whole nearer the highway was worth more than other parts further removed insofar as highest and best

use development is concerned. Each witness readily admitted that had he appraised the 14.9456 acres as a single tract of land, disregarding the remainder and the access rights, his appraisal would have been higher. After exclusion by the trial court of these witnesses' opinions as to value based on the above method of appraisal, the State did not choose to bring in their value testimony based on an appraisal of the condemned land as a whole taking. Also on voir dire, the State's third value witness, Edmonds, appraised the strip taken in conformity with the trial court's ruling that the remainder and retained access was not to be considered; his opinion of the value of the property taken was $227,860.50. Edmond's testimony was later given in evidence before the jury.

◼ The witness Stork testified out of the presence of the jury as to his position with the Highway Department and then explained that Exhibit No. 5 was a set of the contract drawings for the construction of a portion of the West Loop Freeway and the South Loop Freeway. These plans were prepared under Stork's supervision and reflected the improvements to be erected upon the condemned strip. As to Exhibit No. 6, Stork testified that it was a map showing the freeway as it would be constructed through the subject property. All of Stork's testimony was excluded by the trial court as being immaterial to a jury finding of the market value of the land taken. We agree that such evidence was immaterial, and the trial court was correct in excluding it.

It is apparent that the ultimate result here to be obtained is to be governed by a determination of the nature of the right of access and its effect upon or incidence in determining market value and damages in condemnation suits. That is to say, in a situation like we now have before us, is the right of access a burden upon the land taken which is to be considered as reducing the fair market value to be paid for land condemned, or is it a property right appurtenant to the remainder which is material only to a determination of damages or benefits, if any, to such remainder?

◼ At least one case has recognized quite frankly that "[t]he precise origin of [the concept of access rights] is somewhat obscure but it may be said generally to have arisen by court decisions declaring that such right existed and recognizing it." Bacich v. Board of Control, 23 Cal.2d 343, 144 P.2d 818, 823 (1943). It is a safe assumption, supported by virtually all of the authorities, that the view of access as a property right was originally "deduced by way of consequence from the purposes of a public highway." 3 Tiffany, Real Property 927 (3d ed. 1939); and see also the dissenting opinion in Muhlker v. New York & H. R. R. Co., 197 U.S. 544, 572, 25 S. Ct. 522, 49 L.Ed. 872 (1905). Early road construction was by local citizens as well as for local use, and almost all highways or roads were for the purpose of "land service." Moreover, the abutters often donated the land, labor, and materials necessary to the road construction and maintenance, and in view of this, it seldom occurred to anyone to attempt to deny their right to use the road for ingress and egress. Whatever its origin, the right is now clearly established as a concomitant of ownership of land abutting on a highway. See Covey, Control of Highway Access, 38 Neb.L.R. 407 (1959); Duhaime, Limiting Access to Highways, 33 Ore.L.R. 16 (1953); 25 Am. Jur., Highways § 154.

◼ The Texas courts have recognized that abutting property owners have certain private rights in existing streets and highways in addition to their right in common with the general public to use them. Generally, the most important of these private rights is the right of access to and from the highway. DuPuy v. City of Waco, 396 S.W.2d 103 (Tex.Sup.1965) (viaduct); City of San Antonio v. Pigeonhole Parking of Texas, 158 Tex. 318, 311 S.W. 2d 218, 73 A.L.R.2d 640 (1958) (street); Powell v. Houston & T. C. R. Co., 104 Tex.

219, 135 S.W. 1153, 46 L.R.A.,N.S., 1615 (1911) (street); Adams v. Grapotte, 69 S. W.2d 460 (Tex.Civ.App.1934), aff'd, 130 Tex. 587, 111 S.W.2d 690 (1938) (sidewalk); Pennysavers Oil Co. v. State, 334 S.W.2d 546 (Tex.Civ.App.1960, err. ref.) (limited-access highway). This right of access has been described as an easement appurtenant to the abutting land, which includes not merely the ability of the abutting landowner to enter and leave his premises by way of the highway, but also the right to have the premises accessible to patrons, clients and customers. See 10 McQuillin, Municipal Corporations 671 (3d ed. 1950); 28 C.J.S. Easements §§ 1–4; 39 C.J.S. Highways § 141; Rest. Servitudes §§ 450 (a), 453, 507; Clark, The Limited-Access Highway, 27 Wash.L.R. 111 (1952); Note, 3 Stanford L.R. 298 (1951). That this right of access is a property right which is encompassed by Article 1, Section 17 of the Constitution of Texas, Vernon's Ann.St., is so well settled as to require no citation of authority.

 This Court announced in State v. Carpenter, 126 Tex. 604, 89 S.W.2d 194, 979 (1936), that the issues to be determined in a condemnation suit where a strip of land has been taken for highway purposes are (1) the fair market value of the strip actually taken, regardless of any benefits derived from the improvements contemplated by the condemnor, and (2) damages for any diminution in value of the landowner's remaining property by virtue of the severance or the use to which the strip taken is to be put. Such diminution may be offset by increased value of the remaining land by reason of the improvement to be constructed on the land taken. Judgment will, in all events, be in favor of the landowner for the value found in response to the first issue regardless of benefits to the remainder. Carpenter, supra, 89 S.W.2d at 202.

The Carpenter case was written, of course, in the context of a highway or road to which previously abutting landowners

and newly abutting landowners, without distinction, have access as a matter of right, but the language therein establishes beyond dispute that the use to which the land taken is to be put is material only to a determination of damages or benefits to the remainder, when damages to the remainder are sought by the condemnee. This Court stated, at 197:

"* * * [I]t has become recognized as necessary in practically all cases, in arriving at the just compensation to which an owner is entitled in condemnation cases, where a part only of a tract is taken, to take into consideration the two elements, to wit, the fair market value of the part taken, or its intrinsic value in case there is no market value, and the damages occasioned to the remainder of the tract by reason of the taking and the construction of the improvement for which it is appropriated. In all cases where the element of offset on account of benefits is involved, it is necessary to ascertain the value of the portion actually taken so that compensation may be paid therefor in money. * * *"

Further, at 198, the Court, quoting from an earlier Court of Civil Appeals opinion, said:

"'* * * The cost of additional fencing, establishing watering places, and other items of like nature necessitated by the laying of the road do not constitute a measure of damage and are not recoverable as distinct items of damage, but evidence of this nature is admissible, and is entitled to be accorded its proper probative force in determining whether the tract of land as a whole has been damaged. These are matters which may and should be considered by the jury or court trying the case. *In like manner increased and better road facilities may be taken into consideration as offsetting such damage.* * * *'" [Emphasis added.]

 Therefore, as a general rule, when the taking of land for highway purposes

results in a new or increased access to the remaining and abutting property, this benefit may be considered by the jury as offsetting any damages due to the severance of the land taken and, conversely, if the taking should result in a deprivation of reasonable access which the remaining land previously enjoyed, the loss occasioned by this denial may be considered as an element of damage to the remainder. Here the record conclusively shows that the State is not guaranteeing direct access to the expressway portion of the highway to respondents' remaining property but only access to the frontage road; it is reasonable to assume that, if the State had sought to deny access from the remainder to the frontage road, respondents would not have waived damages to the remainder. As pointed out above, the State contends that retention of access is a circumstance which should be considered by the jury in arriving at the fair market value of the land taken even where no damages to the remainder are sought by the landowner.

◼ In an article entitled Condemnation of Land for Highway or Expressway, by Dan Moody, Jr., 33 T.L.R. 357 (1955), the author considers the value of access rights [1]

---

1. "* * * The right [of access] apparently originated in connection with the basic purpose for which nearly all highways and streets, until very recently, were constructed. These roads were designed largely to afford ready access to the lands over and beside which they ran. It is obvious that this purpose could hardly be accomplished unless the abutting landowners had a right of ingress and egress. It is not hard to see the reasoning behind the right of access concept in connection with such roads and highways. However, with the development of highways designed primarily as arteries for the expeditious flow of traffic between more or less distant centers of population, this reasoning can no longer be said to apply to all roads and highways. Most of the cases mentioning the right of access have involved public ways admittedly designed primarily to serve the abutting property, and many of them involved an interference, often by an individual, with a more or less conceded right of access. As a consequence, the cases are full of broad statements regarding this right which are not supported by reasoning which takes into consideration the problem of expressways.

* * * * *

"If land is condemned for the purpose of constructing an old-fashioned highway intended to serve in a substantial manner the area through which it passes, the weight of authority seems to be that the owner of the remaining portions of the tract from which the condemned strip is taken has a right of access to the highway, unless, of course, the judgment of condemnation indicates in some way that that right is being taken. The right of access seems to be implicit in one of the purposes of the highway. However, there is at least one case possibly contrary to that proposition.

"There is a significant difference in the case of condemnation for the purpose of constructing an expressway. In that case, the intention to serve the area through which the highway passes is likely to be decidedly secondary and perhaps nonexistent. It seems clear that if the plans manifest in the condemnation proceeding call for a highway which will deny access over long stretches, an abutting landowner will not be held to have any right of access, for in that case it would be clear that the condemning authority intended to take his right of access. There is more difficulty where the plans as manifest at the time of condemnation call for some sort of limited access, as by way of a service road, at virtually any point along the highway. It might be argued that the very existence of such limited access is a recognition of the right of access. On the other hand, experience has taught that increasing traffic may require substantial curtailment of access to the highway and even its elimination for long stretches, in the interest of safety. Consequently, it may be argued that the complete taking of this right is foreseeable in the case of any expressway.

"Since direct authority is completely lacking, a statement of what the law is in this latter case could be no more than an educated guess. However, it can be said that the only safe course is to insist on consideration of this point in the condemnation proceeding; *if the condemning authority refuses to agree that a right of access is being retained, it must be assumed that it is being taken, and the landowner will be entitled to damages on that basis.*" [Emphasis added.]

to be an element of severance damages, and his conclusion that the nature and extent of the use to which the severed strip is to be put by the State is material only to a determination of damages or benefits to the remainder is in harmony with the basic holding in State v. Carpenter, supra. It necessarily follows that if the landowner waives all claim to damages to the remainder, then damages because of denial of access, or benefits because of access being permitted, becomes immaterial to a determination of the fair market value of the land taken.

In 1957, the Legislature enacted Article 6674w, Vernon's Annotated Texas Statutes, authorizing the State Highway Commission to construct and modernize controlled access highways. Article 6674w–1 [2] deals with the rights of abutting landowners to access to such new highways whether

**2.** Article 6674w–1 provides: (subsection 2 only)

"Control of Access. The State Highway Commission, by proper order entered in its minutes, is hereby authorized and empowered:

"(a). To designate any existing or proposed State Highway, of the Designated State Highway System, or any part thereof, as a Controlled Access Highway;

"(b). To deny access to or from any State Highway, presently or hereafter designated as such, whether existing, presently being constructed, or hereafter constructed, which may be hereafter duly designated as a Controlled Access Highway, from or to any lands, public, or private, adjacent thereto, and from or to any streets, roads, alleys, highways or any other public or private ways intersecting any such Controlled Access Highway, except at specific points designated by the State Highway Commission; and to close any such public or private way at or near its point of intersection with any such Controlled Access Highway;

"(c). To designate points upon any designated Controlled Access Highway, or any part of any such highway, at which access to or from such Controlled Access Highway shall be permitted, whether such Controlled Access Highway includes any existing State Highway or one hereafter constructed and so designated;

"(d). To control, restrict, and determine the type and extent of access to be permitted at any such designated point of access;

"(e). To erect appropriate protective devices to preserve the utility, integrity, and use of such designated Controlled Access Highway; and,

"(f). To modify or repeal any order entered pursuant to the powers herein granted.

"Provided, however, that nothing in the foregoing subparagraphs (a) through (f), inclusive, shall be construed to alter the existing rights of any person to compensation for damages suffered as a result of the exercise of such powers by the State Highway Commission under the Constitution and laws of the State of Texas.

"Subject to the foregoing limitations any order issued by the State Highway Commission pursuant to such powers shall supersede and be superior to any rule, regulation or ordinance of any department, agency or subdivision of the State or any county, incorporated city, town or village, including Home Rule Cities, in conflict therewith.

"No injunction shall be granted to stay or prevent the denial of previously existing access to any State Highway upon the order of the Commission except at the suit of the owner or lessee of real property actually physically abutting on that part of such State Highway to which such access is to be denied pursuant to the Commission's order, and then only in the event that said abutting owner or lessee shall not have released his claim for damages resulting from such denial of access or a condemnation suit shall not have been commenced to ascertain such damages, if any.

"Along new Controlled Access State Highway locations, abutting property owners shall not be entitled to access to such new Controlled Access State Highway locations as a matter of right, and any denial of such access shall not be deemed as grounds for special or exemplary damages, except where access to such new Controlled Access State Highway shall have been specifically authorized by the State Highway Commission to or from particular lands abutting upon such new Controlled Access State Highway in connection with the purchase or condemnation of lands or property rights from such abutting owners to be used in such new Controlled Access State Highway location, and the State Highway Commission thereafter denies access to or from such particular abutting lands to such State Highway at the point where such lands actually abut upon such State Highway."

constructed over previous highway rights of way or over new ones. We have found no cases interpreting this statute in the context of the exact question we have before us, nor is it necessary to undertake an extensive or far-reaching interpretation of its total effect. It is apparent, from a study of the statute to the extent required for a determination of the issues presented in this case, that the statute recognizes pre-existing access as a compensable item of damages and authorizes the Highway Commission, within its discretion, to grant access to abutting lands which theretofore had no access to such controlled access highway. Furthermore, there is nothing in the statute inconsistent with the conclusion we have reached as to the nature and incidence of the right of access, and its place in condemnation suits. In the instant case, respondents had access to the highway at the time of the condemnation which was an incident of and appurtenant to their whole property. A portion of their property has been condemned, but the access appurtenant to their remaining land is still attached thereto and is immaterial to a determination of the fair market value of the part taken.

■ Access to a highway or road from lands abutting thereon may be likened to an easement appurtenant to such abutting lands. An easement "passes with the dominant estate as inseparably connected with it, the person who alone has at any particular time any right to the easement being the person who is at that time the owner of the dominant estate. It does not exist as a personal right, and cannot be enjoyed apart from the dominant estate." 2 Walsh, Law of Real Property, § 230, p. 553 (1947). "An appurtenant easement is an incorporeal right, which is attached to and belongs with some greater or superior right. * * * It is said to be appurtenant when it inheres in the land, concerns the premises, and is necessary to the enjoyment thereof, and is in the nature of a covenant running with the land, attached to the lands to which it is appurtenant, and

* * * [i]t cannot exist unconnected with the land, to the enjoyment and occupation of which it is incident." 2 Thompson on Real Property, § 321, p. 64 (1961). "Where the owner imposes upon one part of his estate an apparent and obvious servitude in favor of another [part], and, at the time of the severance of ownership, such servitude is in use, and is reasonably necessary for the fair enjoyment of the other, then, whether the severance is by voluntary alienation or by judicial proceedings, the use is continued by operation of law. * * * A right-of-way appurtenant to land is appurtenant to every part of it." Thompson, supra, § 322, p. 75.

■ For the reasons above stated, we hold that when the landowner seeks damages to his remainder by reason of the severance of the land condemned, denial of access is to be considered in arriving at such damages and retention of access is to be considered in offsetting such damages. Respondents had the right to waive damages to the remainder. Having done so, the issue of access rights became irrelevant to a determination of the issue of the fair market value of the fee title to the tract of land actually condemned. Therefore, the circumstance of retained access cannot be considered in reaching an opinion as to the value of the land taken. To allow such testimony before the jury would be to permit, in effect, the consideration of an element of enhancement to the remainder in determining the taking issue. The trial court was correct in excluding the testimony of the State's witnesses, Legge and Dailey.

■ Another question involved in petitioner's second and third points of error is whether the trial court erred in refusing to allow the State's witnesses, Legge and Dailey, to average the lower priced acreage on the remainder of respondents' property with the higher priced frontage acreage being condemned, thereby resulting in a uniform per acre value throughout the entire 103-acre tract which then determined the

value of the 14.9456 acres being condemned. Again the witnesses recognized that this computation would result in a different and lower figure than an appraisal based on an assumed whole taking, but the State here contends that this is a proper method of valuation, and, as support for its contention, cites the following cases: McFaddin v. State, 373 S.W.2d 259 (Tex.Civ.App. 1963, n. r. e.) ; Harris County Flood Control District v. Hill, 348 S.W.2d 806 (Tex. Civ.App.1961, n. w. h.) ; Coastal Transmission Corporation v. Lennox, 331 S.W.2d 778 (Tex.Civ.App.1960, n. w. h.) ; Central Power and Light Company v. Graddy, 318 S.W.2d 943 (Tex.Civ.App.1958, n. w. h.) ; Floyd County v. Clements, 150 S.W.2d 447 (Tex.Civ.App.1941, writ dism.) ; State v. Davis, 140 S.W.2d 861 (Tex.Civ.App.1940, n. w. h.) ; Pillot v. City of Houston, 51 S.W.2d 794 (Tex.Civ.App.1932, n. w. h.) ; and State v. Carpenter, supra. We have examined these authorities, and, insofar as there is language therein inconsistent with the rule of valuation announced in this opinion, it is now disapproved. The State also cites several decisions from other jurisdictions concerning the method of valuation in situations identical with or similar to the situation here before us which supports its contention that a pro rata method of appraisal is proper. City of Los Angeles v. Allen, 1 Cal.2d 572, 36 P.2d 611 (1934) ; City of Grand Rapids v. Barth, 248 Mich. 13, 226 N.W. 690, 64 A.L.R. 1507 (1929) ; and in re Fourth Avenue, Borough of Manhattan, City of New York, 221 App. Div. 458, 223 N.Y.S. 525 (1927).[3] These cases are also inconsistent with our view. Therefore, we decline to follow any holding of this or any other jurisdiction which leads to the adoption of a method of valuation which would result in depriving the condemnee of his property without the full compensation to which he is entitled. There is no valid reason for valuing the strip of land taken under a different theory of appraisal solely because no damages to

the remainder are claimed by the landowner. See the case of Territory of Hawaii, by Sharpless v. Adelmeyer, 45 H. 144, 363 P.2d 979, 984–85 (1961) where it is recognized that there are many pitfalls inherent in the approach contended for by the State; see also 4 Nichols on Eminent Domain § 14.31 [1] at p. 728 and § 14.231 at p. 545.

In the present case, it is beyond dispute that the land being condemned had, *at the time of the taking,* a significantly higher per acre market value than the land not being condemned which lay further from the highway. The State's theory is that since the frontage of the highway has merely moved over to the remaining land of respondents, thereby increasing the value of the newly abutting land, in effect, the State has only condemned a composite 14.-9456 acres of the whole tract. We cannot agree with this theory. Such post-condemnation increase in value of the respondents' remaining land may occur, but the conclusion is inescapable that such appraisal would result in offsetting the estimated enhanced value of the remainder after the condemnation against the market value of the part taken at the time of the condemnation. It is well settled that "the value of the part taken should be ascertained by considering such portion alone, and not as a part of the larger tract * * *" and "enhancement in market value of the residue of the land by reason of 'special benefits' is a legitimate offset to damages thereto, but not to the value of the part actually taken." State v. Carpenter, supra, 89 S. W.2d at 197 and 201. As was said in 3 Nichols on Eminent Domain § 8.6206 [1] at pp. 97–98:

"* * * [T]here can be no doubt that the tendency in recent years has been away from that principle [the before and after rule] and toward the adoption of the rule that the land taken, at least, must be paid for in money without con-

---

3. See the dissent by McAvoy, J., for a concise statement of what we consider to be the better view. 223 N.Y.S. 529.

sideration of benefits to the remaining land. The development of the later rule is undoubtedly explained by the fact that the propensity of many American communities to be over-sanguine in regard to the beneficial results of projected public improbements had resulted in the taking of much valuable private property for which the owners never received any compensation other than anticipated benefits which never accrued. It was a reaction to this injustice that led to the ready adoption of a rule which, while in theory unsound, would as a matter of practice bring about a more equitable result, and in the cases in which injustice resulted, would distribute the effects of it upon the public at large."

Since the Carpenter case, Texas has consistently followed this rule as opposed to the before and after rule, and we are still convinced that this approach will more often achieve justice for all parties. Any language in Carpenter to the contrary is dictum and not in harmony with the tenor of the opinion generally, especially the statement "unless, of course the issue of damages to the remainder of the tract is not involved." The trial court was correct in restricting the witnesses to an appraisal of the property condemned without regard to the remainder. Therefore, for the reasons above stated, petitioner's first five points of error are overruled.

 Petitioner's sixth point of error complains of the affirmance by the Court of Civil Appeals of the trial court's action in permitting respondents' value witnesses to testify as to twelve comparable sales. Petitioner argues that these sales were not comparable in that they were in fee simple and included all rights in the land and were not burdened with an easement of access. This was petitioner's only complaint going to show that the sales were not comparable, and in view of our decision that access rights are only material to an issue of damages to the remainder, if such are sought by the condemnee, the admission of testi-

mony as to such comparable sales was proper. Petitioner's sixth point of error is overruled.

Therefore, for the reasons above stated, the judgments of the trial court and the Court of Civil Appeals are affirmed.

GRIFFIN and HAMILTON, JJ., dissenting.