**STATE of Texas, Appellant,**

v.

**ADSS PROPERTIES, INC., Appellee.**

**No. 04–93–00041–CV.**

Court of Appeals of Texas,
San Antonio.

March 14, 1994.

Rehearing Denied April 26, 1994.

Mark A. Hopkins, Asst. Atty. Gen., Austin, for appellant.

Walter C. Wolff, Jr., Wolff & Wolff, San Antonio, for appellee.

Before PEEPLES, GARCIA and GERALD T. BISSETT,[1] JJ.

## OPINION

BISSETT, Justice (Assigned).

This is a suit by the State of Texas, (hereinafter "the state") to condemn 0.651 of an acre out of an 8.683–acre tract of land located in Bexar County, Texas. The purpose of the taking was to widen State Loop 1604 from a two-lane facility to a four-lane controlled access highway, with frontage roads. The state is the condemnor and ADSS Properties, Inc. is the condemnee. Following the award of Special Commissioners to ADSS Properties, Inc. in the amount of $95,000, objections were filed by ADSS Properties, Inc. on August 18, 1988, and trial to a jury began on October 11, 1991.

## BACKGROUND

The condemnor, the state, on the 7th day of September 1988, deposited into the registry of the trial court the sum of ninety-five thousand and no/100 dollars ($95,000.00) for the use and benefit of ADSS Properties, Inc. and Apple Ready–Mix, Inc.[2]

Two issues were submitted to the jury. The first issue required the jury to find the market value of the 0.651–acre tract condemned for highway purposes as of September 7, 1988, the date of taking. The jury found the market value of the tract taken by

1. Assigned to this case by the Chief Justice of the Supreme Court of Texas pursuant to TEX.GOV'T CODE ANN. § 74.003(b) (Vernon 1988).

2. The money ($95,000) awarded by the Commissioners was withdrawn by ADSS Properties, Inc. prior to the rendition of judgment by the trial court.

condemnation to be $96,416.00. The second issue required the jury to find the reduction, if any, in the market value of the remaining property. The jury found the reduction in the market value of the remainder of the tract to be $2,215.00.

ADSS Properties, Inc. filed a motion for judgment notwithstanding the verdict on the ground that the verdict of the jury was not supported by probative evidence because the state's appraisal was reached by "averaging." The motion was granted and judgment was rendered for ADSS Properties, Inc. The trial court found in the judgment that the amount of the judgment in favor of ADSS Properties, Inc. should be "the sum of $113,-428 plus the sum of $253,425, less the sum of $95,000 ... paid" by the state. Accordingly, judgment was rendered that ADSS Properties, Inc. recover from the state "the sum of $365,879.12," which included pre-judgment interest on $271,853 at the rate of 6 percent per annum from September 1, 1988, plus pre-judgment interest from September 1, 1988, until August 15, 1992, at the rate of 10 percent per annum, and post-judgment interest on $365,879.12 from date of judgment until paid at the rate of 10 percent per annum. We reverse and render.

The State of Texas filed a condemnation action to obtain needed right-of-way for the improvement of State Loop 1604 in San Antonio, Texas. The case to determine the amount of compensation the state should be required to pay was tried before a jury. Each party had an opportunity to present its respective theory of the case, and each did so. The jury, for whatever reasons, found the landowner's evidence less persuasive than what was presented by the state.

After the trial was over and the jury discharged, the landowner moved for and obtained judgment notwithstanding the verdict on the ground that the testimony presented by the state's valuation expert should be disregarded because it was based on an improper method of valuation. Judgment was rendered for the landowner on the lowest valuation evidence considered by the court to be supported by probative evidence.

The state argues that its appraisal witness used proper appraisal methodology in valuing the property taken, and, therefore, there exists no basis for the trial court to disregard the findings by the jury.

ADSS Properties, Inc., the landowner, argues that it is beyond dispute that the land which was condemned had, at the time of taking, a higher value than the remainder of the 8.683 acres, which was further removed from State Loop 1604. It also argues that the remainder had flooding problems, and that it was improper for the state's appraiser to "average" the lower priced acreage in the remainder with the higher priced highway frontage acreage which was condemned.

In 1988, the state, pursuant to its right of eminent domain, sought the fee simple title to a 0.651-acre tract of land owned by ADSS Properties, Inc. The land taken by condemnation is a strip approximately 113 feet by 258 feet in dimension and is out of the tract of 8.683 acres.

The 8.683-acre tract is a rectangular tract, being approximately 250 feet wide, fronting on State Loop 1604, and is about 1,500 feet deep. The tract was purchased by Apple Ready Mix, Inc. from Del Wurzbach on January 10, 1984, for $178,000.00, which calculated to be $0.47 per square foot. Later, Apple Ready–Mix, Inc. changed its name to ADSS Properties, Inc. Mr. Dan Schoenfeld was the sole owner of Apple Ready–Mix, Inc., and is the sole owner of ADSS Properties, Inc., (hereinafter referred to as "the landowner"). Apple Ready–Mix, Inc. filed a disclaimer in the present suit.

Following the objections to the award of $95,000 made by the commissioners to ADSS Properties, Inc., trial commenced before a jury. The state presented value evidence through Mr. A.C. Schwethelm, a San Antonio area appraiser, and the landowner presented value evidence through Mr. Tom F. McNeil and Mr. Kirby Gholson, San Antonio area appraisers. All duly qualified as expert witnesses in the field of appraising real property. Each appraiser demonstrated familiarity with the subject property and the neighborhood in which it is located. Each identified and described several photographs and discussed the subject land's attributes and the factors which influenced value estimates.

There is a wet weather creek that crosses the 8.683 acres diagonally, consisting of approximately 0.717 of an acre; the drainage area was designated by Mr. Schwethelm during the testimony as Drainage Area No. 1. The landowner placed a drainage pipe and filled in this drainage area to allow use to be made of the rear two-thirds of the property. A second drainage area lies to the rear of the property, which was designated during the testimony as Drainage Area No. 2, and consists of approximately 0.688 of an acre. Eighty percent of the 8.683-acre tract is in the Edwards Aquifer Recharge Zone.

Most of the land in the immediate vicinity of the subject land is undeveloped, but the area is in transition to being developed, both residentially and commercially, and is in the path of commercial development.

The landowner's theory of the case was that the highest and best use of the property is for a combination asphalt and concrete batching plant site and that the taking impacts severely the value of the remainder of the property for that use. Mr. Schoenfeld testified regarding the ideal location of the property and of the many economic advantages which inure to the batch plant business from such location. He testified that having the plant next to a quarry offers two principal advantages: 1) a ready supply of raw materials is available, which lessens the need to stockpile such materials and reduces inventory costs; and 2) the cost of transporting the materials is reduced somewhat by being able to haul quantities well in excess of legal load limits and by being able to use heavy trucks which are prohibited from using the highway system. In addition, he testified that the property was especially suitable as a batch plant site because of its close proximity to the areas of new construction, and he explained that to be competitive it is necessary for the plants to be within a short distance of such construction to hold down transportation costs and to provide acceptable products. He made site improvements on the 8.683-acre tract after its purchase

from Mr. Wurzbach, including clearing and paving the tract, drilling a water well thereon, and installing a drainage pipe across Drainage Area No. 1. He further stated that he purchased the minimum land area needed to operate efficient and profitable asphalt and concrete plants. He described in some detail the operation of the plants and the reasons he felt that every square inch of the land was needed for the maximally productive use of the property. He contended that the taking of the 0.651 of an acre makes the remainder of the property far less valuable as a batch plant site because the property no longer had sufficient land area to operate both the asphalt and the concrete plants. This claim was the thrust of the landowner's claim for remainder damages. To support his contention in this regard, Mr. Schoenfeld testified that since the taking the company has been utilizing a portion of an immediately adjoining tract of land, owned by Mr. Wurzbach, for stockpiles and maneuvering vehicles. The size of the neighbor's tract that he has been using is about the same size tract as that taken by the state. To further support his contention, Mr. Schoenfeld testified that because the company had less land area for stockpiling raw materials, a silo and additional tractor trailer rigs were purchased.

Mr. McNeil, an appraiser for the landowner, testified that he prepared two reports wherein he estimated the condemnation damages due as a result of this taking. The reports were prepared in January 1990 and May 1991, and the value findings are shown, as follows:

| | First Report 1/24/90 | Second Report 5/30/91 |
|---|---|---|
| Whole | 1,333,108 | 1,383,552 |
| Taking | 113,428 | 113,428 |
| Remainder Before | 1,219,680 | 1,270,120 |
| Remainder After | 1,036,728 | 1,016,695 |
| Damage | 182,952 | 253,425 |
| Compensation Due | 296,380 | 366,853 |

Mr. Gholson, also an appraiser for the landowner, testified that he prepared three reports in this case. The reports were prepared in January 1990 and June 1991, and the value findings are shown, as follows:

|  | First Report 1/24/90 | Second Report 1/24/90 | Third Report 6/4/91 |
| --- | --- | --- | --- |
| Whole | 1,833,029 | 1,985,713 | 1,799,020 |
| Taking | 155,969 | 148,880 | 155,969 |
| Remainder Before | 1,677,060 | 1,836,833 | 1,643,051 |
| Remainder After | 1,451,419 | 1,595,421 | 1,193,242 |
| Damage | 225,641 | 241,412 | 449,809 |
| Compensation Due | 381,610 | 390,292 | 605,778 |

In preparing their first reports, Mr. McNeil and Mr. Gholson testified that they estimated the value of the rear 1.033 acres (Drainage Area No. 2) to have no value. Mr. McNeil valued the balance of the whole property, consisting of 7.651 acres, at $4.00 per square foot, whereas Mr. Gholson, using the same methodology, valued what he described as the useable area at $5.50 per square foot.

In preparing their final reports, Mr. McNeil and Mr. Gholson divided the whole property into three separate categories and placed a separate valuation on the land area within each category. Their testimony may be summarized as follows:

Mr. McNeil testified that the land within Drainage Area No. 1, consisting of 31,232 square feet, had a value of $3.60 per square foot, or $112,435; the land within Drainage Area No. 2, consisting of 29,970 square feet, had a value of $0.10 per square foot, or $2,997.00; and the remainder of the whole property, consisting of 317,030 square feet, had a value of $4.00 per square foot.

Mr. Gholson testified that the land within Drainage Area No. 1, consisting of 31,250 square feet, had a value of $4.50 per square foot, or $140,625; the land within Drainage Area No. 2, consisting of 50,000 square feet, had a value of $0.50 per square foot, or $25,000; and the remainder of the whole property, consisting of 296,981 square feet, had a value of $5.50 per square foot.

The state's theory of the case is different from that of the landowner. Mr. Schwethelm, the state's expert witness on value, testified that the highest and best use of the property is "investment commercial," which he explained means that the typical purchaser of the property would be someone who would hold the property until such time as it would be economically feasible to develop. He further testified that the highest and best use would not be for a concrete and asphalt batch plant site because:

(1) there are many other properties that are potential sites for batch plant operations, but which do not have significant cross-drainage and the associated risk of surface water runoff carrying contaminants into the water supply; that the restrictions to protect the environment are expected to become more exacting and thus, they were of great concern; and that the legal concerns influenced his determination that batch plant usage was not the highest and best use of the property; and

(2) the lease of the subject property by ADSS Properties, Inc. to the children of Mr. Schoenfeld for $1,000 or $1,250 per month [3] is not sufficient income to the land to support the value of the land as indicated by comparable sales.

However, Mr. Schwethelm did not dismiss the possibility that the property could be used as a batch plant location on an interim basis and to offset holding costs, "as long as the environmental problems do not become too onerous." He defined "an interim use" to be a use which allows the investor to decrease his holding costs during the interim period and which usually does not require a significant investment, such as used-car lots, flea markets, mobile home sales lots, or mini-warehouses. He stated that the batching plant operation is an interim use of the subject property, and he testified that the fact that the property is leased for $1,000 or $1,250 per month and is utilized for batch

3. The landowner produced evidence that the rental was not "an arms-length transaction."

plant purposes supports his opinion that such use is interim only.

Four sales were described by Mr. Schwethelm as being considered by him in reaching his value conclusions, three of which he included in his report. Mr. Schwethelm provided the following information relating to each sale:

|  | |
|---|---|
| | Sale Number 1 |
| Date of Sale | June 1985 |
| Size | 40.914 acres |
| Price/Sq. Ft. | $2.51 |
| Location | Approximately a mile and three-tenths east of the subject land |
| Corner | Judson Road and Loop 1604 |
| Utilities | Telephone and electricity available |
| Indicated Value | $2.81 per square foot |
| | |
| | Sale Number 2 |
| Date of Sale | May 1986 |
| Size | 17.183 acres |
| Price/Sq. Ft. | $3.50 |
| Location | Approximately a mile and three-tenths west of the subject land |
| Corner | Corporate Woods Street and Loop 1604 |
| Utilities | Telephone, electricity, water, and sewer available |
| Indicated Value | $2.70 per square foot |
| | |
| | Sale Number 3 |
| Date of Sale | April 1985 |
| Size | 26.821 acres |
| Price/Sq. Ft. | $2.90 |
| Location | On Blanco Road across from Canyon Creek Country Club |
| Corner | No |
| Utilities | Not on site, but easy to obtain |
| Indicated Value | $2.75 per square foot |
| | |
| | Sale Number 4 |
| Date of Sale | January 1984 |
| Size | 8.258 acres |
| Price/Sq. Ft. | $3.50 |
| Location | Next to Alzafar Shrine property (Mr. Schwethelm testified that cross-examiner's description of the location being on Loop 1604, west of U.S. 281, was consistent with the witness's recollection of the location of the property.) |
| Indicated Value | Not included by Mr. Schwethelm in his report. |

In reconciling the three sales considered most comparable to the subject (sale numbers 1, 2, and 3), Mr. Schwethelm testified that he considered sale number 1 to be the most appropriate of the three sales to utilize because it is in close proximity to the subject land and "it has many of the same characteristics." Mr. Schwethelm's value testimony of the property may be summarized as follows:

| | | |
|---|---|---|
| Whole Property | $1,062,830 | |
| Take | | $79,685 |
| Remainder Before the Taking | 983,145 | |
| Remainder After the Taking | 980,930 | |
| Net Damage | | 2,215 |
| Total Compensation | | $81,900 |

In arriving at his estimation of value for the part taken, Mr. Schwethelm first analyzed whether the 0.651 of an acre tract being condemned constituted an economic unit and then determined that it did not. He explained that having only 117 feet of depth and being an interior tract, it "just couldn't be used by itself as an economic unit." He added: "That's not to say that you couldn't use it for something, but you couldn't use it for its ultimate or to its highest and best use by itself." Based on this determination, he valued the part taken as a pro rata part of the whole property.

The remainder property, consisting of 8.032 acres, has the same characteristics as it did before the taking and, accordingly, the same sales were relied upon by Mr. Schwethelm in estimating the value of the remainder. He testified that compensation to the landowner in the amount of $2,215.00 is necessary to put the remainder property "back in a condition similar to what it was before" the taking, which included the replacement of a fence along the front property line and an electric power pole serving the asphalt plant and office.

On cross-examination, Mr. Schwethelm explained again that the whole property was a single economic unit with a highest and best use of investment pending future commercial development. He explained that he did not penalize the value of the property due to drainage or environmental concerns because, in his opinion, those concerns would not prevent the property from being developed to its highest and best use.

Engineering studies were prepared by the Transportation Department engineers to determine whether the culvert placed by the landowner in Drainage Area No. 1 was adequate. The studies indicated that the pipe was not adequate and such information was furnished to Mr. Schwethelm. He testified that after he received the information from the Transportation Department engineers he did not change his valuation of the subject property

because, in my opinion, when the subject property is developed for commercial purposes, a site plan will have to be developed, a development plan or a plan of construction. In other words, an engineering study of the overall plan of development of the property will have to be done. I was aware at the time that I inspected it that it was highly likely—in fact, almost a sure

thing—that the pipe would have to be replaced at the time that the commercial development took place anyway. The significance of the pipe and the fill, the main significance of it was that it allowed the interim operation of the batch plant. My conclusion, after hearing the engineers' information, was that the possibility of flooding or the probability of flooding, while it would be an inconvenience and while it could cause some problems to the batch plant operation, it would not make it impossible to operate as an interim use certainly. So, it did not affect—In my opinion, it did not affect the ability to develop the property for its long-term use, commercial use, because the drainage would be redone at that time anyway.

Mr. Schwethelm rejected the premise that the highest and best use of the property is as an asphalt and concrete batch plant site or that the property is unique or special. He explained that the subject property is in competition with a number of other possible batch plant locations which in his opinion would be significantly better locations for that use. He testified that just because the property is being used as a batch plant site it "doesn't mean that that's the highest and best use," it simply means that the property, if so utilized, meets the special needs of the owner.

Since the whole property is a single economic unit with a highest and best use of investment, pending future commercial development, Mr. Schwethelm valued it as such. He valued the entire site at $2.81 per square foot and rejected the notion that the land within the two drainage areas should have been valued separately and that by not doing so he had used improper appraisal methodology. He justified his opinion by stating:

> There's really nothing to average. I used the sales of property; and the way you arrive at the selling price per square foot is to take the total selling price and divide it by the number of square feet, and that gives you what is sold for per square foot. Then, by making adjustments to that selling price, I arrived at an indicated value of

the subject property. I considered the subject property as an economic unit.

In my opinion, when it's developed for commercial purposes, at that point in time in the future, it will be developed as one tract. It won't be chopped up into little pieces. It will be developed as one tract. So, the $2.81 applies to all of it because it is one integral tract.

The jury's finding in answer to Question No. 1 calculates a finding of $3.40 per square foot for the part taken. The jury's finding in answer to Question No. 2, being exactly the amount testified to by Mr. Schwethelm, is a clear repudiation of the landowner's claim that the value of the remainder tract was diminished by the taking, other than by the cost to replace the fencing and electrical pole.

## POINTS OF ERROR

The State of Texas complains of the judgment in six points of error. We first discuss the first five points. The state contends that the trial court erred in rendering judgment notwithstanding the verdict (first point) and in disregarding the verdict of the jury as to questions one and two because there was some evidence of probative value that supported the jury's answers to those questions (second and third points of error). The state further contends, in its fourth point of error, that the trial court erred in rendering judgment "on the lowest valuation evidence considered by the court to be supported by probative evidence." The state asserts in its fifth point of error that the trial court erred in failing to render judgment on the verdict of the jury. All of the five points mentioned above will be considered together.

■ Before a trial court may grant judgment notwithstanding the verdict, the moving party must satisfy the two-pronged requirement of rule 301 of the Texas Rules of Civil Procedure. The rule states that a court may render judgment notwithstanding the verdict *if* a directed verdict would have been proper, and that the court may disregard any jury finding on a question that has no support in the evidence. Tex.R.Civ.P. 301.

■ A directed or instructed verdict is warranted only when the evidence conclu-

sively demonstrates that no other verdict could be rendered, and the movant is entitled, as a matter of law, to a judgment. *Bywaters v. Gannon,* 686 S.W.2d 593, 595 (Tex.1985). In determining whether it was proper to instruct a verdict, the appellate court must view the evidence in the light most favorable to the party against whom the instructed verdict was granted, and every inference that may properly be drawn from the evidence must be indulged against the instruction. *White v. White,* 141 Tex. 328, 331, 172 S.W.2d 295, 296 (1943). If the record reflects any evidence of probative force in favor of the party against whom the instruction was granted, the appellate court must hold the instruction improper. *White,* 141 Tex. at 331, 172 S.W.2d at 296. Thus, it is error to grant an instructed verdict when evidence and reasonable inferences from the evidence raise issues of fact. And, if an instructed verdict would not be proper, it is error to grant judgment notwithstanding the verdict. *See* 47 TEX.JUR.3d *Judgment* § 140 (1986).

A judgment notwithstanding the verdict must not be disturbed if there is no evidence upon which the jury could have made the findings relied upon. *Trenholm v. Ratcliff,* 646 S.W.2d 927, 931 (Tex.1983). All testimony must be viewed in the light most favorable to the party against whom the motion is sought, and every reasonable meaning that may be inferred from the evidence is to be indulged in that party's favor. *Trenholm,* 646 S.W.2d at 931.

It has long been the rule of this state that the opinions, judgments, or inferences of expert witnesses ordinarily do not establish any material fact as a matter of law. *See Hood v. Texas Indem. Ins. Co.,* 146 Tex. 522, 524, 209 S.W.2d 345, 346 (1948). A jury may accept or reject such opinions, or the jury may find its own opinion from the evidence and by utilizing its own experience in matters of common knowledge. *Maryland Cas. Co. v. Hearks,* 144 Tex. 317, 321, 190 S.W.2d 62, 64 (1945); *Coxson v. Atlanta Life Ins. Co.,* 142 Tex. 544, 548–49, 179 S.W.2d 943, 945 (1944).

The Supreme Court of Texas, in *State v. Windham,* 837 S.W.2d 73, 76 (Tex.1992), agreed "that when the highest and best use of the land is disputed [as is the case before us in this appeal], it is for the jury to decide which use is appropriate, and thus whether the condemnee's evidence of valuation is correct, when it determines the market value of the condemned tract."

Applying the foregoing principles to the instant case, this court, in order to affirm the judgment, must be satisfied that reasonable minds could not conclude:

(1) that the highest and best use of the whole property is investment, pending future commercial development;

(2) that the whole property is a single economic unit and that all of such tract would be utilized when the property is developed to its highest and best use;

(3) that the value of the part taken could be $3.40 per square foot, as the jury found; and,

(4) that the reduction in value of the remainder property could be limited to the cost of replacing the fencing and electrical pole, as the jury found.

Both parties took the position that the whole property constituted a *single* economic unit, albeit each urged opposing views of its highest and best use. The parties agreed that the part taken was of insufficient size to be considered an economic unit. Each party presented its theory of the case to the jury, as follows:

(1) The state contended that the entire property would be developed as a unit to its highest and best use and that each part of the property contributed the same amount to its overall value. Mr. Schwethelm explained that at the time the property is developed it would be developed as one tract.

(2) ADSS Properties, Inc. asserted that it purchased the 8.683 acre whole property for the purpose of utilizing it for a batch plant operation and that the property was ideally suited for that purpose. Further, it took the position that every square inch of the property was necessary for such use and that the taking of the slightest portion dramatically diminished the value of the remainder property for such use.

■ In its motion for judgment notwithstanding the verdict, ADSS Properties, Inc. asserted that the jury's verdict, as to both questions submitted, was not supported by probative evidence. It maintained that Mr. Schwethelm's testimony should be disregarded because "it is based upon the 'averaging' method and as such is not probative evidence" of the value of the part taken or damages to the remainder. We do not agree.

Mr. Schwethelm did not average higher value land with lower value land to arrive at the value of the whole property, the part taken, or the remainder property. When he was cross-examined regarding the methodology he used, the following exchange took place:

Q. Did you average the various portions of that property to come out with this $2.81 figure?

A. No. There's really nothing to average.... I considered the subject property as an economic unit.

In my opinion, when it's developed for commercial purposes, at that point in time in the future, it will be developed as one tract. It won't be chopped up into little pieces. It will be developed as one tract. So, the $2.81 applies to all of it because it is one integral tract.

*State v. Meyer*, 403 S.W.2d 366 (Tex.1966), relied on by the landowner, a partial taking case wherein the landowner waived damages to the remainder property and the only question submitted was the value of the part taken, is the preeminent case relating to the issue of *averaging*. The supreme court expressly disapproved of valuation witnesses using the average per-unit value of a larger tract to value the part taken when it is *undisputed* that "at the time of taking" the parcel condemned has a higher unit value than the remainder tract. *Meyer*, 403 S.W.2d at 375. The rationale embraced by the court was that the condemnee would be deprived of the full compensation to which he is entitled if lower per-unit value land outside the taking, comprising one economic unit, were allowed to be mixed with higher per-unit value land within the taking, comprising a separate economic unit.

■ The court's holding in *Meyer* has the effect of allowing the landowner to have the property being condemned valued as though it is a whole taking. The option of waiving remainder damages rests with the condemnee, exclusively, and logically would be exercised only in those circumstances in which the condemnee had some basis to believe that he could maximize his recovery by making the election. In other words, the condemnee would have some basis to believe: 1) that the part being condemned could stand alone and be marketed and developed as a separate economic unit; and 2) that the remainder property constituted a separate economic unit and it likewise could be marketed and developed to its highest and best use.

■ *Meyer* does not apply in this case for the following reasons: First, in the instant case, both parties contended that the whole property constituted a single economic unit, even though each offered dissimilar assessments of what the highest and best use of that unit was. Unless there are at least *two* economic units, *each* with significantly different per-unit values, there can be no improper averaging. Second, for there to be improper averaging it must be *beyond dispute* that the part being taken has a higher per-unit value than land not being condemned. The state's theory of the case was that the whole property would be developed as an integral unit and that *each part* of the property contributed the same. Thus, even if ADSS Properties, Inc. were to contend that the evidence shows that it did not consider the whole property to constitute a single economic unit, that contention was before the jury and it would have been a matter within their sound discretion. *See Windham*, 837 S.W.2d at 77.

■ Improper appraisal methodology was used by the landowner's expert appraisal witnesses who testified in this case. As has been stated, the landowner contended that the whole property consisted of a single economic unit. That being its contention, it was inconsistent for the witnesses of ADSS Properties, Inc. to value the property by the piecemeal approach they used. No contention was made that the drainage areas had a

highest and best use separate from the whole property or that they were marketable as independent economic units.

Judgment should have been granted on the verdict of the jury. The record reflects ample evidence of probative force in favor of the jury's verdict, and therefore it was error for the trial court to render judgment notwithstanding the verdict and to disregard the findings by the jury. In addition to the valuation opinions presented by the state, through Mr. Schwethelm, the record reflects that information regarding several land sale transactions, including the purchase by the landowner of the subject property, was received into evidence. The appraisal methodology used by Mr. Schwethelm in all respects was proper. The authority which proscribes "averaging" applies only when there are two, or more, independent economic units with significantly different values and the valuation estimates derived by the appraiser involved mixing, or "averaging," lower value land with higher value land to arrive at adequate compensation. This was not done by the state's expert appraisal witness, Mr. Schwethelm. He testified that he considered the highest and best use of the whole property to be investment, pending future commercial development, and that the whole property consisted of a single economic unit. He also testified that all parts of the whole property contributed the same amount of value as any other parts. No objection was made to the testimony of Mr. Schwethelm. It is reversible error for the trial court to hold that it can determine damages, as a matter of law, from the conflicting evidence in the record. The state's first, second, third, fourth, and fifth points of error are sustained.

The state further claims in its sixth, and final, point of error that "the trial court erred in failing to render judgment vesting title in the land condemned in the State of Texas." The landowner agrees.

The judgment rendered in this case does not vest title to the land sought to be condemned in the state. The state filed a motion requesting the court to modify, correct, or reform the judgment and render judgment which provides that the state has fee simple title to the land sought to be condemned. The motion was overruled by operation of law.

Texas Rule of Civil Procedure 301 provides that "[t]he judgment of the court shall conform to the pleadings, the nature of the case proved and the verdict, if any, and shall be so framed as to give the party all the relief to which he may be entitled either in law or equity."

Since the judgment fails to vest title to the 0.651 of an acre of land described in plaintiff's petition in the state, it fails to give the state the relief to which it is entitled.

A similar concern was presented to the Austin Court of Appeals in *State v. Resolution Trust Corp.*, 827 S.W.2d 106 (Tex.App.—Austin 1992, writ denied). There, the appellate court sustained the state's point of error and ordered that the trial court's judgment be modified to vest title to the condemned land in the state. *Id.* at 109. Accordingly, the state's sixth point of error is sustained.

The judgment of the trial court is reversed and judgment is here rendered that the State of Texas do have and recover of and from the defendant, ADSS Properties, Inc., fee simple title in and to the property described on page 2 of the plaintiff's second amended petition for condemnation, situated in Bexar County, Texas; and that the defendant have and is entitled to a judgment from the State of Texas in the sum of NINETY–EIGHT THOUSAND SIX HUNDRED THIRTY ONE AND NO/100 DOLLARS ($98,631.00) for the interests in said properties herein condemned, and for damages to the defendant's remaining lands; and that the fee simple title to the property described at said page 2 of the plaintiff's second amended petition is hereby vested in the petitioner, the State of Texas; provided, however, there is excluded from said estate vested in the petitioner all of the oil, gas, and sulphur which can be removed from the land aforesaid without any right whatsoever remaining to the owner of such oil, gas, and sulphur of ingress or egress to or from the surface of said land for the purpose of exploring, drilling, developing, or mining the same; and that the defendant, ADSS Properties, Inc., do have and recover of and from the State of Texas,

condemnor, and the said condemnor be and it is hereby directed to pay to the defendant, ADSS Properties, Inc., the unpaid balance of THREE THOUSAND SIX HUNDRED THIRTY ONE DOLLARS ($3,631.00) for the previously described land and as full compensation for the condemnation thereof hereunder; together with interest on said unpaid balance at the rate of ten percent (10%) per annum from September 7, 1988, until paid; and that upon payment by the condemnor, the State of Texas, of the difference in the amount deposited in the registry of the court, to-wit, NINETY–FIVE THOUSAND AND NO/100 DOLLARS ($95,000.00), and the amount of money found by the court to be the market value of the land acquired by the condemnor, the State of Texas, together with damages to defendant's remaining lands, to-wit, NINETY–EIGHT THOUSAND SIX HUNDRED THIRTY ONE AND NO/100 ($98,631.00), which sum of money is THREE THOUSAND SIX HUNDRED THIRTY ONE DOLLARS ($3,631.00), plus interest at the rate of ten percent (10%) on said THREE THOUSAND SIX HUNDRED THIRTY ONE DOLLARS ($3,631.00) from September 7, 1988, until paid, the condemnor, the State of Texas, shall stand RELEASED AND DISCHARGED of its constitutional obligation to pay such compensation for the taking of the above-described property for public use; and that all court costs incurred in this proceeding be and they are hereby taxed against plaintiff, the State of Texas, which costs shall be paid to the county clerk of Bexar County, Texas.