02-11-067-CV









 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00067-CV

 

 


 
 
 Crosstex
 DC Gathering Company, J.V.
  
  
 v.
  
 Terry
 Titus Button, Ossie A. Button, T & O Legacy, Ltd., and Southwest
 Securities, FSB, f/k/a First Savings Bank, FSB
 
 
 §
  
  
 §
  
  
 §
  
  
 §
  
  
 
 
 From the Probate Court
  
  
 of
 Denton County (ED-2007-00402)
  
  
 January
 24, 2013
  
  
 Opinion
 by Justice Dauphinot
 
 


 

JUDGMENT

 

This
court has considered the record on appeal in this case and holds that there was
no error in the trial court’s judgment.  It is ordered that the judgment of the
trial court is affirmed.

          It
is further ordered that each party shall bear its own costs of this appeal, for
which let execution issue.

SECOND DISTRICT COURT OF APPEALS

 

 

By_________________________________

   
Justice Lee Ann Dauphinot

 

 

 

 

 


 
 
 
 
 
 
 
 
 
 
 
 
 
 COURT OF APPEALS
 SECOND DISTRICT OF TEXAS
 FORT WORTH
  
 
 


 

 

NO. 02-11-00067-CV

 

 


 
 
 Crosstex DC Gathering Company, J.V.
 
 
  
 
 
 APPELLANT
 
 
 
 
  
 V.
  
 
 
 
 
 Terry Titus Button, Ossie A. Button, T & O
 Legacy, Ltd., and Southwest Securities, FSB, f/k/a First Savings Bank, FSB
 
 
  
 
 
 APPELLEES
 
 


 

 

----------

FROM THE Probate
Court OF Denton COUNTY

----------

MEMORANDUM
OPINION[1]

----------

Appellant
Crosstex DC Gathering Company, J.V. condemned a portion of land owned by Terry
Titus Button and Ossie A. Button for purposes of a pipeline easement.[2] 
The Buttons objected to the commissioner’s award, and the issue of damages
resulting from the easement was tried to a jury.  Crosstex now appeals from the
part of the trial court’s judgment in condemnation awarding the Buttons
$794,798.99 for damages to the remainder of their property resulting from the
condemnation.  In two issues, Crosstex argues that the trial court’s judgment
should be reversed and a take-nothing judgment should be rendered on Appellees’
remainder damages claim, or, alternatively, a new trial ordered or a remittitur
suggested.  Because we hold that the evidence was not insufficient to support
the jury’s findings, we affirm the trial court’s judgment.

Background

Crosstex
attempted to purchase an easement from the Buttons in order to build a pipeline
across their property.  When the parties could not agree on the value of the
easement, Crosstex filed a suit in condemnation, seeking a permanent pipeline
easement and a temporary construction easement.  Crosstex sued the Buttons and
Appellee T & O Legacy, Ltd. (based on its asserted ownership interest under
an unrecorded deed from the Buttons), as well as Southwest Securities, FSB
(formerly known as First Savings Bank, FSB), which has a lien on the property
(collectively the Buttons).  The petition asserted that after construction of
the pipeline, the Buttons “shall have the full use and enjoyment of the land
described in the easement, including . . . the right to lay out and construct .
. . utilities . . . across the easement, provided that any such
utilities shall cross the easement at not less than a 45 degree angle to said
pipeline.”  The petition stated that the Buttons would retain the right to use
the land covered by the easement “for all purposes not inconsistent or conflicting
with [Crosstex’s] use of the easement for a natural gas gathering pipeline
provided that [the Buttons’] activities do not endanger, obstruct, injure[,] or
interfere with [Crosstex’s] pipeline facilities.”

The
special commissioners appointed by the trial court assessed the Buttons’
damages at $44,955.00.  After the Buttons objected to the award, the case
proceeded to trial.  The parties stipulated that the only issues to be
determined at trial were (1) the amount of money due to the Buttons for the
taking of the temporary construction easement and permanent easement and (2)
the damages, if any, to the remainder of the property as a result of the
easement.

In
discovery, the Buttons disclosed the identity of two expert witnesses they
planned to have testify at trial: Jamie Wickliffe, an expert appraiser, and Jon
Cross, an engineer.  Crosstex filed pretrial motions to strike the testimony of
both witnesses.  As to Cross, Crosstex objected that  his methodology was
unreliable as he based his opinions on an incorrect assumption that Crosstex
would not allow the Buttons to develop the area above the pipeline; he did not
calculate any additional costs a developer might encounter in developing the
property and therefore his opinion would not aid the jury in determining the
damages; and he conceded in his deposition that there would likely not be any
actual conflicts with road crossings across the easements, rendering his
opinion on that issue immaterial and irrelevant.

Crosstex
objected to Wickliffe’s testimony on the ground that she relied on Cross’s
opinion that “there is an area of conflict in a potential crossing are[a] along
Copper Canyon Rd.”  Crosstex asserted that Cross testified in his deposition
that there were no conflicts in the potential crossing areas, and he never
calculated any additional costs a developer might encounter in developing the
property.  Crosstex argued that Wickliffe’s “methodology is unreliable as there
is an analytical gap between [Cross’s] opinion that there is no potential conflict
and [Wickliffe’s] opinion [that] the remainder of the property is damaged.”

Crosstex
also objected that Wickliffe’s testimony was unreliable and irrelevant because
she presumed “that a portion of the subject property is available for zoning
(i.e.[,] commercial) that is currently not available, nor likely to become
available within reasonable probability under the local zoning ordinance.”

After
a hearing, the trial court overruled these objections, and both witnesses
testified at trial.  The jury found that the fair market value of the permanent
easement was $124,530.96 and that damage to the remainder of the property was
$665,968.03.  The trial court valued the temporary easement at $4,300.00.  The
trial court rendered judgment in accordance with its finding and the jury’s
findings on damages, ordering that the Buttons be awarded damages of
$749,843.99 plus $44,955.00 that Crosstex had deposited into the registry of
the court.

Crosstex
filed a motion to modify the judgment or alternatively for new trial or for
remittitur, asserting that the evidence was legally and factually insufficient
to support the judgment awarding the damages for the remainder of the property.
 The trial court denied the motion, and Crosstex now appeals.

Standards
of Review and Law Regarding Expert Testimony

For
an expert’s testimony to be admissible, the testimony must be relevant and
based upon a reliable foundation.[3]  When ruling on a
challenge to the reliability of an expert’s testimony, courts “should ensure
that the [expert’s] opinion comports with the applicable professional
standards.”[4]  An expert’s opinion
contains an “analytical gap” that undermines its reliability when the expert’s
opinion does not actually fit the facts of the case.[5]

A
party complaining about the reliability of expert testimony must object to the
evidence before trial or when the evidence is offered to preserve a complaint
on appeal that the evidence is unreliable.[6]  If the trial court
overrules an objection to expert testimony, the opponent of the evidence may
complain on appeal that the evidence is legally insufficient to support the
jury’s causation finding because the scientific evidence is unreliable and,
thus, no evidence.[7]  No objection is required
for an appellant to argue that expert testimony is no evidence because it is
conclusory or speculative.[8]  Thus, when the objection
is to an expert’s methodology, and the trial court must therefore “‘look[]
beyond what the expert said’ to evaluate the reliability of the expert’s
opinion,” an objection is required.  But no objection is required to argue on
appeal that, on the face of the record, the testimony is conclusory and
speculative and therefore lacks probative value because “there is no need to go
beyond the face of the record to test its reliability.”[9]

We
may sustain a legal sufficiency challenge only when (1) the record discloses a
complete absence of evidence of a vital fact; (2) the court is barred by rules
of law or of evidence from giving weight to the only evidence offered to prove
a vital fact; (3) the evidence offered to prove a vital fact is no more than a
mere scintilla; or (4) the evidence establishes conclusively the opposite of a
vital fact.[10]  In determining whether
there is legally sufficient evidence to support the finding under review, we must
consider evidence favorable to the finding if a reasonable factfinder could and
disregard evidence contrary to the finding unless a reasonable factfinder could
not.[11]

When
reviewing an assertion that the evidence is factually insufficient to support a
finding, we set aside the finding only if, after considering and weighing all
of the evidence in the record pertinent to that finding, we determine that the
credible evidence supporting the finding is so weak, or so contrary to the
overwhelming weight of all the evidence, that the answer should be set aside
and a new trial ordered.[12]

Analysis

In
its first issue, Crosstex argues that there is no evidence to support the jury’s
finding of damages to the remainder of the property.  In its second issue,
Crosstex argues that the evidence is factually insufficient to support the jury’s
damages finding.

A.  Cross’s
Testimony

Crosstex
makes two main complaints about Cross’s testimony:  (1) Cross’s testimony was
no evidence of damages because it was purely hypothetical and speculative, and
(2) Cross’s testimony related only to a theory of compensation—impaired (but
not substantially impaired) access to the property—that is not compensable
under Texas law.  We will address these arguments in turn.  First, however, we
will give an overview of Cross’s testimony.

Most
of Cross’s testimony related to a set of requirements that Crosstex promulgated
to regulate development over and around its pipelines.  The document, titled
“General Requirements for Crossing Crosstex Pipelines with
Pipelines/Roads/Utility Lines” (Crossing Requirements), covers the general
requirements for developing the property above, around, and adjacent to the
pipeline.  The requirements range in scope from limitations on landscaping over
the easement to restrictions on blasting operations within five hundred feet of
the pipeline.  Cross went over the requirements, explaining what they meant so
that the jury could understand them and discussing in what way each requirement
would or would not cause a delay or added difficulty in developing the
remainder property.

For
example, the Crossing Requirements state that all utility lines or other
underground facilities to be constructed across a Crosstex pipeline “must be
installed with a minimum vertical separation of 24 inches between structures,”
that “[a]ll facilities crossing a Crosstex pipeline shall be made of, or
encased in, steel pipe with threaded or welded joints the entire width of
Crosstex’s right of way,” and that “[h]orizontal separations will be determined
on a case-by-case basis.”  Cross testified that this requirement “creates a
wall underneath the ground where you can’t . . . take your utilities.”  He
stated that in the absence of a pipeline, such facilities are not normally
required to be made of or encased in steel pipe.  Cross stated that the
“case-by-case basis” language “basically means” that Crosstex has the right “to
tell you where to place your . . . utility.”  The document contains similar
requirements for all underground electrical cables and for any underground
fiber optic cables.

Another
requirement provides that no paving may be placed on Crosstex’s right of way
without written permission from Crosstex.  When paving is permitted, any
proposed roads, streets, or driveways must be constructed with a minimum cover
of forty-eight inches, including the subgrade.  All other surfaces within the
right of way must provide a minimum of thirty-six inches under the right of
way.  Any other paving—such as a parking lot—must be reinforced, not exceed
four inches of thickness, be sectioned in ten-foot by fifteen-foot panels,
contain lifting rings, and conform to the minimum cover requirements.  Cross
testified that restrictions provided by Crosstex “excludes any parking lot that
[he’s] ever seen” and that “[b]asically, it tells me that you can’t build—you
can’t build a parking lot in our —in our easement is what that means to me,
because you can’t build a 4-inch thick parking lot.”  He stated that “it
basically means [that] Crosstex has ultimate control over whether or not you
place parking lots, roadways, driveways, alleyways, any paving on or over or
across their—their easement.”

Cross
stated that as an engineer advising a buyer of that tract seeking to develop
it, he would tell the potential buyer that “it means I may not be able to build
my parking lot or my roadway or my driveway or my fire lane . . . where I need
to put it, or where it’s best for my development.”  Cross also noted that any
parking lot would have to be built in panel sections so that pieces of it could
be removed as needed for access to the pipeline.  He also noted that because
any paving over the easement had to be reinforced, Crosstex is “basically
dictating” that the paving be concrete.  On cross-examination, Cross testified
that these requirements can restrict the kind of development that can be done
on the property.  He mentioned that if the easement restricts the size of the
parking lot that can be built, that has an effect on the size of the building
you can construct because buildings, based on their use, require a certain
number of parking spaces per square foot of building.  He also referenced a
development he had worked on as an example of a project in which the parking
lot size had been restricted by the presence of a pipeline easement.

As
for other structures on the easement, the Crossing Requirements state that
“[n]o signs, monuments, building, structures, manholes, shrubbery, or trees
shall be located within a Crosstex right of way and easement area,” and no
fence may be placed across the right of way without Crosstex’s permission.  If
a fence is permitted, fourteen-foot gates must be installed on the right of
way.  Cross testified that the restriction “tells me I can’t even plant trees
or shrubs” in the easement area.  Thus, any potential developer of the
remainder property would face the possibility of putting no landscaping, no
fencing, no driveways, no parking lots, and no other paving over the easement,
and would have to consider what kind of development could work on the property
with those kinds of restrictions.

Cross
stated that pipeline companies can be difficult to work with and that when a
developer brings him more than one property to develop, he typically suggests
that “they can find a similar property without the gas pipeline easement
. . . because of the unknowns, like control, that they may have
in developing around the gas pipeline easement.”  Cross testified that to some
degree, gas pipelines like the Crosstex line always cause problems for
development.

A
civil engineer experienced in site and land development projects, Cross
explained to the jury what these requirements would entail for anyone wishing
to develop the property in any manner.  His testimony was not limited to any
particular kind of development—for example, what difficulties someone
subdividing the property into lots would face.  Instead, he testified to how
the restrictions would or would not add complications to development of any
kind.

Keeping
the above in mind, we now turn to Crosstex’s arguments about Cross’s testimony.
 We begin with Crosstex’s argument that Cross’s testimony was no evidence of
damages because it was entirely speculative.

1.
 Whether Cross’s testimony is speculative and impermissibly based on
hypothetical subdivisions.

Crosstex
points out that because the property has no improvements on it, Cross could not
testify to problems that the condemnation caused to any existing development,
and therefore testimony about any problems a developer might have is purely
hypothetical.  And, Crosstex argues, because Cross’s testimony was based on hypothetical
development plans it cannot form the basis of a reliable expert opinion, and
because his testimony was nothing more than speculation and conjecture as to
possible future land development, “untethered to any real development plan,” it
was no evidence at all.

Crosstex
is correct that testimony that is too speculative is unreliable and should not
be admitted by the trial court.[13]  And in many
circumstances, testimony about hypothetical developments is no evidence from
which a jury may make determinations about market value.[14] 
But all valuation opinion involves some level of speculation.[15] 
The question here is what kind of valuation testimony is reliable, probative
evidence of market value and what is not and in which category Cross’s
testimony best fits.

One
method for establishing the market value for property is the comparable sales
approach under which the appraiser (1) finds data for sales of similar property
and then (2) adjusts those sales prices up or down based on differences between
those properties and the property being valued.[16] 
Comparable sales must involve land with similar characteristics.[17] 
A trial court should refuse to admit a sale as comparable “if the comparison is
so attenuated that the appraiser and the fact-finder cannot make valid
adjustments for these differences.”[18]

Crosstex
is correct that when the property being valued is undeveloped, “one seeking to
prove the value of such a tract of land may not show what the price of the lots
would be if subdivided, or show the price for which already subdivided lots
were selling.”[19]  This kind of evidence
fails for two reasons:  such evidence “tends to cause the jury to value the
land as lots, presumably at a higher market value,”[20]
and the sales price of individual, improved lots does not meet the test of
similarity.[21]  In other words,
property that has been subdivided into lots is too dissimilar to undeveloped
property, rendering a comparison too attenuated for the appraiser to make valid
adjustments for the differences between the properties, and a jury might assign
more value to an undeveloped property than its actual market value when
presented with plans of hypothetical lots.  Thus, a party who wants to
establish the market value of an undeveloped tract of land may not do so by
drawing up hypothetical plans of nonexistent subdivisions and then developing
an opinion about the market value for the tract based on what those individual
hypothetical lots could sell for.[22]  A party may, however, testify
about the adaptability of a particular property for use as a subdivision.[23]

Evidence
of factors affecting the marketability of property is admissible for
establishing damages in condemnation suits.  For example, fear of a proposed
pipeline in the mind of the public may be relevant to a determination of the
market value of taken property.[24]  The perception that
potential future annexation of property could limit the property’s use is
another example of a circumstance that may be properly considered in assessing
the current value a willing buyer and seller would place on the property.[25]

Although
Crosstex points out the rule in condemnation valuation cases that “[e]vidence
should be excluded relating to remote, speculative, and conjectural uses, as
well as injuries, which are not reflected in the present market value of the
property,” that is only part of the rule.[26]  The Supreme Court of
Texas has also said that generally, it is proper to admit evidence “upon all
such matters as suitability and adaptability, surroundings, conditions before
and after, and all circumstances which tend to increase or diminish the present
market value.”[27]  It is only remote,
speculative, and conjectural uses that are not reflected in the property’s
value that should be excluded.

If
Cross’s testimony, then, were of remote or speculative future uses or future
injuries that would not be reflected in the market value of the property at the
time of the taking, then it should have been excluded.  But Cross’s testimony
related to real circumstances—the additional complications that arise when
developing around a pipeline and the manner in which Crosstex exercises its
rights under its easements.  Cross’s testimony that a buyer would have to
consider the pipeline’s presence and Crosstex’s easement in deciding to what
use the property could be put is not mere speculation.  This testimony related
to factors that a willing buyer and willing seller would consider in
determining the market value of the property at the time of the taking.  To the
extent that these circumstances affect the property’s marketability and would
be reflected in the property’s market value, the testimony was relevant.

Cross
did not give an opinion on the market value of the property, did not testify
about a hypothetical subdivision plan, and did not attempt to compare the
unimproved property with improved property.  The cases prohibiting testimony
about using the market value of hypothetical subdivisions to prove the market
value of unimproved land are simply not applicable to Cross’s testimony.[28] 
His testimony was not the kind of hypothetical speculative development
testimony prohibited by Texas law.

Crosstex
argues that Cross drew up hypothetical development plans and then testified
about three hypothetical driveways in order to show damage to the remainder. 
But Cross only testified about the plans and the driveways when asked about
them on cross-examination.  That was not the focus of his testimony.  And his
testimony with respect to those plans was that the plans were only drawn up as
examples.  He did not base a conclusion about damages or even about development
difficulties for the remainder property on those plans.

Crosstex
relies in part on State v. Delaney, in which the Supreme Court stated
that “while condemned property may be appraised at its highest and best use,
remaining property on which there are no improvements and to which reasonable
access remains, is not damaged simply because hypothetical development plans
may have to be modified.”[29]  Delaney is
readily distinguishable, however.  In Delaney, landowners sued the State
for inverse condemnation, claiming that the State’s removal of a road abutting
their property caused substantial and material impairment of access to their
property.[30]  The Delaney
court reiterated its previous holding in Santikos that, with respect to
unimproved property, “an impairment claim cannot be sustained on the basis that
‘someday a developer might want to build a driveway at the single most
difficult and expensive location on the entire property.’”[31] 
Delaney does not stand for the proposition that a landowner may never
recover for damages to unimproved property based on problems for and
restrictions on development created by a taking and affecting the property’s
market value.

Crosstex
also points to Dawmar Partners[32] for the proposition that
appraisal testimony cannot be based on speculative or hypothetical uses, and to
Carpenter[33] for the proposition that
evidence of remote, speculative, and conjectural uses should be excluded.  Dawmar
Partners is another impairment of access case.  The Supreme Court, as it
had in Delaney, once again held that a landowner may not recover for
impairment of access based on speculative or hypothetical uses of unimproved
remainder property.[34]  The court held that the
restrictions of access in that case “resulted only in increased circuity of
travel, which this Court has repeatedly held is not compensable.”[35] 
But like Delaney, Dawmar Partners does not stand for the
proposition that a landowner may never recover for damages to unimproved
property based on a decrease in market value because of potential difficulties
in development resulting from the taking.

As
argued by Crosstex and as stated above, the Carpenter court stated that
“[e]vidence should be excluded relating to remote, speculative, and conjectural
uses, as well as injuries, which are not reflected in the present market value
of the property.”[36]  But in the immediately
previous sentence, the Carpenter court stated that “[g]enerally, it may
be said that it is proper as touching the matter of the value and depreciation
in value to admit evidence upon all such matters as suitability and
adaptability, surroundings, conditions before and after, and all circumstances
which tend to increase or diminish the present market value.”[37] 
So although evidence is to be excluded if it is entirely speculative and “not
reflected in the present market value of the property,” evidence in
condemnation cases is not restricted to only the use to which the land is
currently being put.  Evidence of the property’s condition and adaptability
that would increase or decrease the present market value of the property is,
generally speaking, properly admissible.[38]

We
also point out that another case cited by Crosstex, Cannizzo,[39]
does not bar the kind of testimony offered by Cross.  In Cannizzo, the
landowners were not offering evidence valuation of the property based on what
it would sell for to a developer who hoped to subdivide the property at some
point in the future.  The landowners there “were seeking valuation of their
property as if it were a developed, primarily residential subdivision.”[40] 
In our case, the landowners are not seeking valuation of their property as if
it were already subdivided as in Cannizzo.  Instead, they produced
testimony about the value of the property to a developer who would take into
consideration the uses to which the property could reasonably be put.

In
summary, Crosstex argues that because the land is currently undeveloped, Cross’s
testimony about problems a developer would face are impermissibly
hypothetical.  But even Crosstex’s own expert agreed that the highest and best
use of this property is a blend of residential and commercial development. 
That means that the market value of the property should be determined giving
consideration to what a willing buyer would pay for the property for that use.[41] 
But Cross’s testimony was evidence that any development over or near the
easement would face complications because of Crosstex’s pipeline and easement. 
If a developer wants to build a driveway, parking lot, or any other kind of
paving over the easement; landscape over the easement; run utilities around the
pipeline; or put a fence across the easement, the developer has to address
Crosstex’s requirements.  In this case, a statement as to what actual use the
land will ultimately be put by a hypothetical buyer is speculative.  But Cross’s
testimony, which related to the fact that development will be more complicated
and development options more limited because of the pipeline, is not.

Because
the prohibition on speculative testimony and on value testimony based on
hypothetical subdivision plans does not bar Cross’s testimony, we overrule this
part of Crosstex’s first issue.

2.
 Whether Cross’s testimony was no evidence because it only supported a claim of
impaired access.

Crosstex
next argues that the damages asserted by the Buttons through Cross’s testimony
relates to impaired access to the property, which is an injury that is not
compensable under Texas law unless the access is substantially impaired.  As
Crosstex points out, damages that result merely from traffic being required to
travel a more circuitous route to reach the condemnee’s property are not
compensable.[42]  We would therefore
agree with Crosstex’s argument if Cross testified merely that any potential
developer would have to design plans such that the driveway did not run across
the pipeline and therefore an impairment existed to accessing the remainder
property.  Because there was no evidence produced by the Buttons that there
would be no other way to access the remainder property except over the
pipeline, they did not establish substantial impairment to the remainder.  So
if, as Crosstex claims, their theory of damages was based on impaired access,
there would be no evidence of damages.  But Crosstex is not correct that the
Buttons’ theory of damages was access impairment.

As
stated above, the Buttons argued that because of the pipeline and easement,
development of the remainder property would be more complicated and that even
though part of the property had a highest and best use for commercial
development, the market potential for commercial development had been
negatively affected by the easement, and the market value of the property was
decreased thereby.  Because the Buttons damages theory and Cross’s testimony did
not hinge on impaired vehicle access to the property, we overrule this part of
Crosstex’s first issue.

B. 
Wickliffe: Appraisal Testimony

The
second part of Crosstex’s first issue is that Wickliffe’s testimony is no
evidence of damages.  Crosstex raises three main complaints related to
Wickliffe’s testimony:  (1) Wickliffe’s reliance on Cross’s testimony fatally
undermines her own testimony; (2) Wickliffe’s analysis improperly assumed a
change in use and zoning that was unsupported by and inconsistent with known
evidence; and (3) Wickliffe’s comparative-sales analysis is unreliable and
irrelevant.

In
some of its arguments, Crosstex complains about the underlying data to support
Wickliffe’s valuation opinion.  The Supreme Court once held the view that
“[w]hile lack of supportive market data would tend to diminish the reliability
of expert testimony, such goes to the weight and not the propriety of
evidence.”[43]  In more recent cases
addressing reliability and expert testimony, the Supreme Court has indicated
that examination of the facts underlying an expert’s opinion is a part of
determining the reliability of the expert’s opinion.[44] 
At least one court of appeals has relied on Wheeler to hold that to the
extent lack of market data would affect the reliability of an expert’s
appraisal opinion, it does not necessarily make the data inadmissible.[45] 
We need not determine whether a lack of market data to support a valuation
opinion makes an opinion too unreliable to constitute admissible evidence
because the arguments Crosstex raises about the reliability of Wickliffe’s
valuation testimony relate to whether the testimony constitutes sufficient
evidence to support the jury’s verdict and not to whether the evidence should
have been admitted in the first place.

1.  Whether
Wickliffe’s reliance on Cross’s testimony undermines her testimony.

Crosstex
argues that Wickliffe’s reliance on Cross’s irrelevant and unreliable testimony
fatally undermines her own testimony.  It is unclear to what extent, if any,
Wickliffe used Cross’s report in formulating her opinion.[46] 
But to the extent Wickliffe used Cross’s report in forming her valuation
opinion, she could have correctly used his report as part of an assessment of
what value a willing buyer would place on the remainder because of the
perception that Crosstex’s easement could limit the property’s use.  An expert
may consider the property’s potential for future uses as well as the perception
of the property’s potential for future uses in determining what a willing buyer
would consider in deciding whether to buy a property and for how much.[47] 
And because we have determined that Cross’s testimony was not irrelevant and
unreliable for the reasons asserted by Crosstex, its argument here is
unpersuasive.  We overrule this part of Crosstex’s first issue.

2.  Whether
Wickliffe’s analysis improperly assumed a change in use and zoning unsupported
by evidence.

In
support of this argument, Crosstex first contends that Wickliffe assumed a
change in the use and zoning of the property in order to inflate the
calculation of damages to the remainder and that the gap between the evidence
presented at trial and her highest and best use assumptions was so great as to
make her conclusions no evidence.  Crosstex argues that in considering highest
and best use, speculative and hypothetical uses cannot be considered, and there
was no evidence of any current or proposed development on the property. 
Wickliffe nonetheless valued the property as mixed residential and commercial
use, changing the zoning on twenty-six acres of the tract from residential to
commercial even though there was no official act of any governmental body
implying that these acres would at some point in the future be zoned commercial.

We
first point out that Crosstex’s expert agreed with Wickliffe that the highest
and best use for the property was a mix of residential and commercial
development.  So although Crosstex argues in its brief that the Buttons needed
to rebut the presumption that leaving the land undeveloped was its highest and
best use and that they failed to do so, this argument is unpersuasive because
its own expert agreed with Wickliffe.  Thus, the testimony at trial supported
Wickliffe’s assertion that the property’s highest and best use was a mix of
residential and commercial development.  As both sides agreed that development
was the highest and best use for the property, it was not improper for
Wickliffe to develop on opinion on the basis that such development was the
property’s highest and best use.  The only dispute on this point, then, was not
over whether the highest and best use for the Buttons’ property was as
developed property but over how much of the Buttons’ property had a highest and
best use as commercial development as opposed to residential.

We
therefore turn to Crosstex’s argument that twenty-six of the fifty-two acres of
the Buttons’ property that Wickliffe valued as commercial property were zoned
as residential at the time of the taking and that Wickliffe “upzoned” these
acres with no basis for doing so.  Crosstex argues that for all twenty-six
acres that Wickliffe “upzoned,” she provided “no actual or specific evidence
demonstrating a probability of a zoning change.”  Crosstex further argues that
there was no evidence of an actual need for more commercial zoning, no evidence
of any current plans to develop the property, and no temporal evidence that any
change in zoning would occur in the near future.

Wickliffe
based her market value opinion on the assumption that 26.26 acres of the
property could be zoned commercial in addition to the 25.83 acres were already
zoned that way.  Approximately fourteen of the twenty-six acres were included
in the city’s future land use plan as zoned for commercial use.  The remaining twelve
acres “upzoned” by Wickliffe were not included as commercially zoned in the
future land use plan.

The
record shows that Wickliffe did not value the twenty-six acres as though
commercial zoning were already in place at the time of the taking.  She valued
that property “not as if the zoning was in place but as if it [were] reasonably
probable for the zoning to be obtained.”  That is, she determined the market
value of the property considering the probability that a buyer could obtain
commercial zoning on that part of the property in the near future and the
effect that this probability had on the property’s value.  She specifically
noted that in her appraisal, she valued the property at a lower value than she
would have if the zoning were already in place.

The
Supreme Court has stated that it “is a matter of common knowledge that cities
frequently lift zoning ordinances or reclassify property in particular zones
when the business or wants of the community justifies that type of action in
the interest of the general public welfare.”[48] 
Thus, “if it appears reasonably probable to the trial judge that the wants and
needs of the particular community may result, within a reasonable time,
in the lifting of restrictions, [the judge] should admit testimony of present
value based on prospective use of the property for purposes not then
available.”[49] 
So in this case, if it was reasonably probable that the property’s zoning could
be changed to commercial within a reasonable time, then Wickliffe properly considered
that possibility and the effect it would have on the property’s value.[50]

In
its brief, Crosstex argues that the Buttons produced “no actual official
documents that supported [Wickliffe’s] change of use” and “did not testify to
any specifics of her conversations with others, and . . . did not testify that
any city official actually stated that a zoning change would likely take
place.”  It points out that its own expert testified that the people he spoke
with at the city “indicated [that] there was nothing in the works for any
additional commercial zoning there and that they did not anticipate any” and
that he asked them if “they were aware of anything anticipated or whether they
felt like that . . . might occur, and the answer was no.”

This
valuation situation was not one in which the entire property was, for example,
residential, and Wickliffe claimed that the highest and best use was commercial
even though nothing indicated that the landowner would be able to get approval
for rezoning and the facts actually suggested the opposite.  In this case, part
of the property is already zoned commercial, and the question is whether
Wickliffe’s opinion is unreliable because she concluded from the facts that a
buyer and seller would contemplate that an additional twelve to twenty-six
acres of the property could be approved for commercial zoning in the reasonably
foreseeable future and whether she had information from which she could reach
that conclusion.  We must also note that the testimony at trial suggested that
part of the property that Wickliffe “upzoned” was in the easement, and Crosstex
expressly does not complain about the value of the easement on appeal. 
Crosstex apparently then only takes issue with the part of the “upzoned”
property that was not in the easement.

Although
Crosstex takes issue with the fact that Wickliffe had no official commitment
for approval of rezoning already in place and that no definite development
plans existed, we do not agree that the case law requires a testifying expert
to make this kind of showing.  The cases that include language even close to
that effect are distinguishable.  For example, in Dawmar Partners, the
Supreme Court pointed out that “the property is zoned for residential use, and
there is no evidence of a pending request for a zoning change, existing
commercial development plans, or a contract for commercial use.”[51] 
But, again, Dawmar Partners is a denial-of-access case, and this
statement was made in connection with the court’s conclusion that “[t]his case
. . . lacks evidence of a material and substantial impairment of
access.”[52]  The court pointed out
that the property’s unimproved state, with no development plans in the works
and with access to the property from two other roads, refuted any suggestion
that the remainder property had been damaged because access to one side of the
property was impaired.[53]  Thus, we look at
Wickliffe’s testimony about why she “upzoned” twenty-six acres not to see if
she rebutted the presumption that the property’s highest and best use was to
leave it undeveloped but to see if it supports her valuation opinion of the
property based on its value as property that can be developed.  The question
here was how much of the property could an expert consider as having a
reasonable probability of obtaining commercial zoning in the reasonably
foreseeable future for purposes of determining what the market value of the
property is.

We
also disagree that the law requires specific temporal evidence of when a
suggested zoning change will occur.  We do not believe the “near future”
language of Zwahr[54] and Cannizzo[55]
relied on by Crosstex sets up a different rule than the “foreseeable future”
and “reasonable time” language used elsewhere.[56]  We do not believe that
the law required the Buttons to produce temporal evidence showing exactly what
time frame a change of zoning would definitely occur or for that matter that it
provides any specific guidance on what time frame the phrase “near future”
encompasses.  And we point out that in nuisance cases, the Supreme Court has
acknowledged that “estimates of market value normally rest on expectations not
about future days but about future years.”[57]

To
see if Wickliffe provided evidence to support her conclusions, we have reviewed
the record.  In her summary report, Wickliffe stated that she had conducted
interviews with the mayor of Copper Canyon and the city director, and in both
interviews the official “indicated that the Town[58]
would be favorable to the expansion of the PD-1[59]
zoning to include a significant portion of the adjoining northern land
including frontage along Copper Canyon Rd.”  She stated that the officials told
her that “the City would most likely be favorable to expanding this PD-1 zoning
to include the Copper Canyon Rd. frontage as far north as [the] northwesterly
bend in the road” and that after analyzing the information she learned in those
interviews as well as the future land use map, she formed an opinion that “it
is reasonable to conclude that additional PD-1 zoning will be available for
expansion to include a significant portion of the northern adjoining land and a
significant portion of the land fronting Copper Canyon Rd. in the reasonably
foreseeable future.”

The
trial court conducted a pretrial hearing on Crosstex’s objections to Wickliffe’s
testimony.  There, Crosstex’s attorney and the trial court questioned Wickliffe
about how she reached her opinion that there was a reasonable probability of
the zoning changing.  She pointed out that of the additional twenty-six acres
she thought would change zoning, about fourteen acres had been included as
commercial usage in Copper Canyon’s future land use plan.

Wickliffe
stated that she had a copy of an email that the town administrator had written
in which the administrator referred to the area she “upzoned” as the “Copper
Canyon Development Corridor” . . . “for commercial purposes.”  The Buttons’
attorney asked her about this email, suggesting that it was an email written in
response to an application by the Buttons to have the zoning on their entire
property changed to commercial.  The attorney asked if this was the email in
which the official told the Buttons essentially that “we don’t think it would
be even in your best interest” to have the entire property zoned as commercial,
but if the Buttons would resubmit a survey on seventy-five acres, he did not
think rezoning that much of the property would be an issue because the area was
along the “Copper Canyon Development Corridor.”  Wickliffe agreed that there
were references to “that Copper Canyon Corridor and discussions with City
administrators regarding the potential for even more zoning than what I had
purported in my highest and best use” and that she had confirmed this
information with city officials.  Crosstex’s attorney asked her if the
application had been denied, but Wickliffe stated that in fact the Buttons had
pulled their application because the city was in the process of “firming up”
its “long-range master plan” and “because of the pipeline and all that was
going on with the property,” and so the Buttons had decided not to go through
the expense of the survey on seventy-five acres that would have been required
for the application.

Wickliffe
stated that she spoke to the person who was the city administrator at the time
she began her investigation, the successor city administrator, the mayor, and
some city council members, all of whom gave her the understanding “that Copper
Canyon Road was being purported to be some kind of a commercial corridor, at
least for a certain depth.”  She confirmed that to her knowledge, the city had
never taken any action or position adverse to commercial zoning in the area she
had “upzoned.”  Wickliffe concluded from her interviews that “there’s no reason
to believe that it would be opposed by anyone in the government or otherwise. 
So the surrounding property owners or the government, everything we have is an
indication that that is reasonably probable within the reasonably foreseeable
future.”  And in forming her opinion as to market value, she “discounted what
those kinds of uses would sell for to account for the risk associated with the
fact that the zoning was not in place.”

At the conclusion of the hearing, the trial court
summarized the testimony on the issue of “upzoning” as follows:

Here you have a lot of supporting activity
by the City.  You have master plans released for public use and public reliance
that at least cover portions of the property that is relied upon by this
appraiser as being commercial-use property.  You do not have . . . an
ordinance passed by the City prior to the date of take that imposes some sort
of requirement adverse to this conclusion made by Ms. Wickliffe.  You have only
actions that would tend to corroborate or support and on which a qualified
licensed professional real estate appraiser might rely.

Then at trial, Wickliffe provided background information
for the jury.  She told the jury that for part of the property she had
“upzoned,” the city had included that property as future commercial property in
its future land use plans, and through interviews, city officials and staff had
indicated that “certainly this Future Land Use Plan would be followed.” 
Regarding the rest of the “upzoned” property, she stated that 

In my conversations with the community
and looking at the development patterns that I had seen in the area and reading
several of their documents, it appeared to me that they planned on this Copper
Canyon roadway having at least some portion of the property proposed to be a
corridor-type zoning, a smaller commercial area of zoning, kind of along the
frontage of the roadways, to create some additional tax dollars to help support
the residential growth in the area.

Copper Canyon is a fairly small
community, and its opportunities for commercial development are fairly limited
to those areas that are on existing corridors that make some sense and have
some availability of utilities.

Combination of those things, along
with the fact that the property owner themselves had inquired about the
possibility of zoning a larger area than what I’ve purported to be commercial,
led me to the conclusion that the right way a buyer would look at this property
in the marketplace would be to assume that [the “upzoned” area] would be
utilized for some type of commercial use.

Wickliffe
also told the jury that she had spoken with the former city administrator about
the city’s master planning process and “the concepts of other types of zoning
on the property,” that she had talked to the current city administrator who
“has carried the City through . . . some of those rezoning processes and [has]
been overseeing the City’s Future Land Use Plan for a while,” that she had
spoken with the mayor and council members “to get a feel for what the political
atmosphere was,” and that she had talked to market participants, “the buyers
and sellers out in the marketplace, people that had signs for sale, properties
for sale up and down the roadway, or people that had bought property in the
area, to talk with them about what the general atmosphere was in the
neighborhood.”  From these conversations, Wickliffe drew her opinion about the
probability of commercial zoning on the additional twenty-six acres of the
Buttons’ property.

For
the approximately fourteen acres that was included in the city’s future land
use plan, we cannot conclude that Wickliffe’s opinion about the value of the
property was so unsupported by and inconsistent with known evidence so as to
render the opinion no evidence.  Under the facts of this case, and considering
that the city has publicly stated that its goal is to rezone this part of the
property to commercial use in the future, it is reasonable to assume that the
city would approve a request for a zoning change to commercial on that
property.  It is also reasonable to assume that a willing buyer would consider
that information in deciding whether to buy the property and at what price and
that a willing seller would consider that information in determining for what
price to sell.  And Wickliffe indicated that it is common for a buyer to buy
property with desired zoning not in place but with the anticipation of
obtaining the necessary zoning change, and that a property with the zoning
already in place would have a higher price than property on which a zoning
change was anticipated.  Considering that Wickliffe determined her value for
the property not as if the property had that zoning in place at the time of the
taking but what the property would sell for given a reasonable probability that
it would have that zoning in the reasonably foreseeable future, we cannot say
her opinion was unreliable and therefore no evidence on this basis.[60]

Regarding
the remaining twelve acres that Wickliffe “upzoned,” we again cannot conclude
that her opinion was no evidence of damages.  She talked to city officials and
city staff, all of whom indicated that the city would be open to rezoning the
amount she included as future commercial property.  Her market research
indicated that the city has limited space for commercial property and that the
area at the time of the taking was growing.  Every indication Wickliffe had was
that the city was supportive of rezoning the property for commercial use and
that the community had a market for the property as commercial.  Given the
information on which Wickliffe relied, we conclude that Wickliffe’s opinion
that there was a reasonable probability that the additional twelve acres would
be zoned commercial in the reasonably foreseeable future and that a buyer would
pay more for the property on that basis did not make her value opinion
unreliable.[61]

Crosstex
points out that its expert testified that he spoke with city officials, who
confirmed that nothing was “in the works” for changing the zoning on the
property and that they did not anticipate any, but that testimony does not make
Wickliffe’s conclusion unreliable.  Jurors may believe one expert and not the
other, and the fact that no plans were “in the works” to change the zoning is
not evidence that the city would be opposed to rezoning the property.[62]

We
recently addressed expert testimony about future government action in State
v. Little Elm Plaza, Ltd.[63]  That case dealt with
testimony that a government would take an action respecting a property in the
future and how that action would injure the landowner.[64] 
We do not have the same kind of testimony in this case.  And in Little Elm,
we observed that in this court, we draw a distinction between two types of
expert testimony about future government action:

[A]n expert may testify about how an uncertainty with
regard to a governmental action may have affected the market value (in other
words, how potential buyers and sellers would weigh the risks related to the
property) on the date of the taking, but an expert may not opine about how that
uncertainty will actually be resolved in a date after the taking when that
opinion is speculative or conjectural.

In
this case, Wickliffe did not testify that Copper Canyon will approve the zoning
change, and therefore the extra twenty-six acres should be valued as if already
commercially zoned.  Instead, she testified about how potential buyers and
sellers would weigh the probability of the zoning being changed.  We overrule
this part of Crosstex’s first issue.

3.  Whether
Wickliffe’s comparative-sales analysis is unreliable and irrelevant.

Crosstex
makes three subarguments in this section.

a.  Flawed
comparable sales study because of excluded sale.

Crosstex
contends that Wickliffe did not follow the comparable sales methodology because
she ignored from her study a known and obviously comparable sale in the
immediate vicinity of her included sales.  Wickliffe testified that the tract
to which Crosstex referred was on a less desirable road than the other three
tracts from that subdivision that she did use (and we observe that from the
plat map, it appears that the tract is also of a quite different shape). 
Wickliffe testified that she could have included the property in her analysis
by making an adjustment for the property’s less desirable location, but nothing
in the record or the case law dictates that she was required to.  Comparable
sales must involve land with similar characteristics, but they need not be in
the “immediate vicinity” of the subject land.[65]  We have found no case
law holding that an opinion on market value is unreliable because it does not
include a comparable sale in the immediate vicinity of the subject property,
and Crosstex has not directed us to any such authority.  The record does not
show that Crosstex or the Buttons produced any evidence that accepted appraisal
methods require certain sales to be included.  Accordingly, we cannot hold that
Wickliffe’s valuation opinion was unreliable merely because it did not include
a sale that Crosstex believes is comparable but that Wickliffe did not.

b.  Flawed
comparable sales study because of included incomparable sale.

Crosstex
next argues that Wickliffe’s comparable sales study was flawed because she
improperly included plainly incomparable sales.  Crosstex takes issue with
three sales in Wickliffe’s study:  (1) a sale off of highway 465, (2) a sale
off of Friendship Road near Lake Ray Roberts, and (3) a property that had two
high-voltage electric transmission lines on it.

Regarding
the first two sales, Crosstex maintains that Wickliffe conceded that there were
huge differences in the values of these two properties but that she failed to
report making any adjustments for their disparities.  It asserts that the sales
“were plainly not comparable even to each other.”

When
using the comparable sales approach to find the market value of a subject
property, the appraiser finds sales of properties that are similar enough to
the subject property to be considered comparable to the subject property.[66] 
The appraiser then adjusts the price of the comparable sales to negate any
differences between the comparable properties and the subject property that may
be reflected in the price.[67]  After making those
adjustments, the appraiser has an idea of what the subject property would sell
for in the market.

The
“paired sale” approach is similar to the process described above, but instead
of attempting to find what similar properties sell for on the market, the
appraiser attempts to figure out how much a condition on the subject property affects
a property’s market value.[68]  The appraiser looks in
the marketplace to find sales of properties that are similar to each other, one
with the condition and one without, and analyzes those sales to determine how
much the condition affects market value.  This method can be used to determine
if the presence of a pipeline on a property affects the property’s market
value:

A widely recognized method of determining whether a
particular characteristic of property has a positive or negative impact on
value is a technique known as a paired sales analysis.  If the appraiser can
find two recently sold properties that are virtually identical except that one
is encumbered by a pipeline or transmission line and one is not, these are
called paired sales.  If the pipeline or transmission line is the only
significant difference between the two, any difference in the sale price may be
attributable to the pipeline or transmission line.  When done correctly, a
paired sales analysis can be compelling evidence of influences on market value.[69]

From
her summary report, Wickliffe appeared to have made both types of comparisons. 
In the main body of her report, Wickliffe discussed the comparable sales that
she found, the adjustments she made, and the adjusted market value of those
properties.  In an addenda, she included a “pipeline study” in which she
conducted a paired sales analysis.

These
two sales complained of by Crosstex here appeared to be part of her pipeline
study rather than the part of her analysis in which she found properties
similar to the Buttons’ property.  That is, they were not each compared with
the Buttons’ property to find their property’s market value.  Wickliffe found
three properties that she considered similar to each other, one with a pipeline
and two without, and compared the sales prices to figure out what kind of
impact the presence of the pipeline would have on a property.

In
this paired sale analysis, the property with a pipeline sold for $8,000 an
acre.  One of the properties without a pipeline sold for $12,404 an acre, and
the other property with no pipeline sold for $22,300 an acre.  In her report,
Wickliffe noted that the property that sold for $12,404 an acre had a small
creek along one boundary “that does contain some flood area in and around it.” 
Her report reflects that she adjusted the price somewhat to account for the
physical differences of the properties.

Wickliffe
did agree with Crosstex’s attorney that there were huge differences in the two
no-pipeline properties’ values, but she did not testify that there were
huge differences between the properties themselves (or between those properties
and the Buttons’ property) for which she needed to make adjustments to sales
prices.  Crosstex elicited no such testimony from her, and her report does not
reflect such differences.  And Crosstex does not tell us in what way the
properties were so different from each other (or the subject property) that an
adjustment should have or could not be made.[70]  Although we recognize
the gap between the sales prices, nothing in the record shows that Wickliffe
should have accounted for significant differences between the properties and
did not.  We therefore cannot say that Wickliffe’s inclusion of these sales
made her opinion so unreliable that it is no evidence.  Furthermore,
considering that the jury’s award reflects that the jury found the property had
been damaged by far less than what Wickliffe found, we cannot say that the
inclusion of these properties in her analysis resulted in an improper verdict.[71]

Regarding
the property with transmission lines, Crosstex argues that Wickliffe conceded
that the inclusion of this property in her analysis meant that she did not do a
true paired sales analysis; in other words, she “didn’t take those two sales
and then compare them to a property within that same general location to
determine the impact of the pipeline and the electric transmission
powers.”  Crosstex argues that it could have been the high voltage lines that
reduced that particular property’s value rather than the pipeline.  Crosstex
asserts that Wickliffe agreed that she found a sale of a property that had a
pipeline but no electrical transmission line, that the sale was for a higher
price than a sale of the nearby property that had both a pipeline and the
transmission line over a small part of the property, and that this “could be an
indication that that [power line] is one of the factors” to account for a
difference between the sales price of those two tracts.

At
trial, Wickliffe testified about these properties in discussing the comparable
sales she used to determine the market value of the remainder after the installation
of the pipeline.  As Crosstex points out, these properties were not used in a
paired sales analysis.  Instead, Wickliffe used the sale of the property with a
transmission line as a comparable sale, one of two commercially-zoned
properties with pipelines that she considered comparable to the Buttons’
property.  This comparison was not a “paired sale” analysis because Wickliffe
did not compare two properties to each other to determine the effect of the
pipeline.  She appeared to have just used the property with the transmission
line to find what property like the Buttons’ property would sell for when burdened
by a pipeline easement.

As
for whether the properties were comparable, Wickliffe discussed the power line’s
presence briefly.  She stated that with respect to the properties with the
electrical transmission lines, the easements on those properties “were
considered to have similar stigmas and damage compared to [the Buttons’] gas
pipe easement encumbrance, therefore no adjustments were deemed necessary.”

That
these sales were not a true paired sales analysis—and Wickliffe did not assert
in her report that they were part of a paired sales analysis—does not mean that
these properties could not be used as comparable sales to determine the market
value of the Buttons’ property after the conveyance of the easement and the
installation of the pipepline.  The assumption that electric power lines could
affect a property’s value is not unreasonable.[72]  As an expert, Wickliffe
had to decide whether it was appropriate to make adjustments for differences
between properties, and, as the fact finder, the jury had to determine the
credibility and weight to be given to her testimony.[73] 
Whether power lines are too dissimilar to a pipeline to make an apt comparison
is a determination for the fact-finder to make.[74] 
Crosstex does not argue that Wickliffe’s conclusion about the “stigma” damage
from transmission lines being similar to that from having a pipeline easement
was incorrect.  Crosstex does not argue that the comparison between the
properties is too attenuated for Wickliffe to make adjustments or on what basis
it makes that conclusion.  And it does not argue that the other paired sales
analysis that Wickliffe conducted (in addition to the one it complains of above)
does not support the jury’s verdict.  Because we cannot conclude that the
inclusion of these sales made her entire opinion unreliable, we overrule this
part of Crosstex’s first issue.[75]

c.  Flawed
comparable sales study because of a blended property value.

Finally
under this argument, Crosstex argues that Wickliffe’s “concoction of what she
called a ‘blended’ property value” destroyed any reliability that remained in
her comparable sales analysis.  Crosstex contends that there was no evidence
that this blended rate was mathematically tied to any of the comparable sales
or that it was tethered to any fact, repeatable calculation, or objective
analysis.

Wickliffe
testified that she used an average per-square-foot price and that she referred
to her resulting calculation as a “blended value.”  The average per-square-foot
price she came up with for the market value before the taking was $2.50 per
square foot.  To come up with this amount, she first determined how much of the
property was zoned residential and what she thought that property was worth per
square foot.  She then determined how much of the property was either already
zoned commercial or would probably be zoned commercial in the foreseeable
future, and she valued this part of the property based on what a willing buyer
would pay considering that the commercial zoning was not in place but that “it
was reasonably probable for the zoning to be obtained.”

Wickliffe
developed an appraisal of the market value this way to show what a buyer would
pay for the whole property, not just the commercial part or just the
residential part.  She stated that in her opinion it would not be fair “to take
those two individual components and add them together to arrive at an opinion
of value for the subject” because she believed “that would escalate the value
of the subject, based on the fact that the zoning is not in place.”  She noted
that some of the properties she used for comparison were also sold for
commercial prices even though the properties were not zoned commercial, but “it
still is a risk and a time fact that a buyer would consider.”  Accordingly,
because she believed the residential and commercial components of the Buttons’
property would sell together, “if you take these individual indicators, you’re
going to see a number higher than what my actual opinion of the whole property
is.”

After
conducting her sales comparison analysis, Wickliffe determined that the value
of the residential component of the tract was $1.15 per square foot and the
value of the commercial component was $5.40 per square foot.  She then adjusted
the value and came up with an average per-square-foot price of $2.50 per square
foot, giving the 144 acres of property a value of $15,771,443 before the
taking, which she rounded down to $15,771,400.

Wickliffe
noted that in her opinion, fifty-two acres of the property had the potential to
be commercial and that “[i]f you just did the math, that would indicate about
$12,250,000 for the commercial component of the tract.”  But because she
thought it would be overstating the value of the property to simply take the
two individual values for the residential component and for the commercial
component and add them, she “applied an economic discount for the risk factor
that the zoning wasn’t in place.”  In doing so, she determined that “the actual
indicator for the commercial component was about $11,400,000.”

From
this testimony, we can determine how much of her total value calculation was
based on commercial and how much was based on residential, how much she valued
the commercial property per acre, and how much she discounted the commercial
section to compensate for not having zoning in place for the entire fifty-two
acres.  As Wickliffe testified, one acre is 43,560 square feet.  Multiplying
that number by fifty-two (acres) and then by 5.40 (the price per square foot
for commercial zoning) results in a value of $12,231,648, a little under her
value of “about $12,250,000.”  We can then see how much Wickliffe discounted
the property’s value because of the risk associated with twenty-six of the
acres not yet having commercial zoning in place.  And taking her estimate of
the market value of the property and dividing it by the total number of square
feet results in a price per square foot of $2.4999, or $2.50—the value that she
reported.  We can repeat her calculations for the per-square-foot value she
reported after the taking.  As far as whether her values were tied to her
comparable sales analysis, Wickliffe explained to the jury her sales comparison
approach and how she reached her conclusions about the value of the commercial
portions of the property and the residential portions of the property both
before and after the taking.

Although
Crosstex argues that Wickliffe came up with her value “seemingly out of thin
air,” not “tethered to any fact, repeatable calculation, or objective
analysis,” her trial testimony makes it clear that the value she used is the
average price per-square-foot for the property based on her determinations,
after a sales comparison analysis, of what the residential and commercial parts
of the property were worth.  Crosstex makes no argument on appeal that using an
average per-square-foot valuation is improper under the law or under accepted
appraisal standards, and we found nothing in the record to that effect.  We did
find, however, at least one other case in which a similar method of valuation
was used.[76]

The
Buttons also point out that Wickliffe testified (and that appraisal standards
provide) that when valuing property with different uses, valuing the uses
separately and then adding those values together may show a figure that is
higher or lower than the actual value of the total property.  We cannot agree
that Wickliffe’s valuation was “out of thin air” and not tethered to any
objective analysis. We overrule the remainder of Crosstex’s first issue.

In
Crosstex’s second issue, it argues that the evidence was not factually
sufficient to support the jury’s verdict.  Because Crosstex relies on the same
arguments with respect to Cross’s and Wickliffe’s testimony as it did under its
legal sufficiency issue, we overrule Crosstex’s second issue for the same
reasons set out above.

Cross-Appeal

In
their sole issue on cross-appeal, the Buttons complain that the trial court
erred by not submitting a single broad form jury question as required by Westgate
Ltd. v. State.[77]  The Supreme Court has
directed that in partial takings cases, the jury should be asked to make two
findings:  the market value of the part taken and damages to the remainder.[78] 
The jury questions followed this directive.  The Buttons have not persuaded us
that a deviation from this directive was called for in this case, and they have
not demonstrated how they were harmed by the question.[79] 
We overrule the Buttons’ sole issue on cross-appeal.

Conclusion

Having
overruled Crosstex’s two issues and having overruled the Buttons’ sole issue,
we affirm the trial court’s judgment.

 

 

LEE ANN DAUPHINOT JUSTICE

 

PANEL: 
DAUPHINOT,
MEIER, and GABRIEL, JJ.

 

DELIVERED:  January 24, 2013









[1]See Tex. R. App. P. 47.4.





[2]At some point, the Buttons
apparently deeded the property to T & O Legacy, Ltd., an entity they
control.





[3]TXI Transp. Co. v.
Hughes, 306 S.W.3d 230, 234 (Tex. 2010).





[4]Id. at 235.





[5]Id.





[6]Faust v. BNSF Ry. Co.,
337 S.W.3d 325, 332–33 (Tex. App.—Fort Worth 2011, pet. denied).





[7]Id.





[8]Coastal Transp. Co.,
Inc. v. Crown Cent. Petroleum Corp., 136 S.W.3d 227, 232 (Tex. 2004).





[9]Id. at 233.





[10]Uniroyal Goodrich Tire
Co. v. Martinez, 977 S.W.2d 328, 334 (Tex. 1998), cert. denied, 526
U.S. 1040 (1999); Robert W. Calvert, “No Evidence” and “Insufficient
Evidence” Points of Error, 38 Tex. L. Rev. 361, 362–63 (1960).





[11]Cent. Ready Mix
Concrete Co. v. Islas, 228 S.W.3d 649, 651 (Tex. 2007); City of Keller
v. Wilson, 168 S.W.3d 802, 807, 827 (Tex. 2005).





[12]Pool v. Ford Motor Co.,
715 S.W.2d 629, 635 (Tex. 1986) (op. on reh’g); Cain v. Bain, 709 S.W.2d
175, 176 (Tex. 1986); Garza v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965).





[13]Exxon Pipeline Co. v.
Zwahr, 88 S.W.3d 623, 629 (Tex. 2002) (stating that evidence is unreliable
if it is no more than unsupported speculation).





[14]See, e.g., City of
Austin v. Cannizzo, 153 Tex. 324, 335, 267 S.W.2d 808, 816 (1954) (holding
that, in a condemnation trial respecting 4.57 acres of unimproved land, “prices
paid for improved lots and the value assigned to improved lots in recent sales
is not admissible” for failing the test of similarity and that “[o]pinion
testimony as to the front[-]foot value of nonexistent lots in a hypothetical
subdivision is too speculative to be admitted as direct evidence of market
value”); see also State v. Willey, 360 S.W.2d 524, 525 (Tex. 1962) (citing
Cannizzo and holding that, in a condemnation trial respecting three
acres of unimproved land, Willey could not “show what the price of the lots
would be if [the land were] subdivided”).





[15]Tex. Pipe Line Co. v.
Hunt, 149 Tex. 33, 40–41, 228 S.W.2d 151, 155–56 (1950) (noting that the
issue of depreciated market value is largely a matter of opinion evidence and
that all opinion is “at best something of a speculation”); LaSalle Pipeline
L.P. v. Donnell Lands, L.P., 336 S.W.3d 306, 315 (Tex. App.—San Antonio
2010, pet. filed) (stating that, “[a]s the Texas Supreme Court has recognized
[in Hunt], all appraisal opinion is at best something of a
speculation”).





[16]City of Harlingen v.
Estate of Sharboneau, 48 S.W.3d 177, 182 (Tex. 2001).





[17]Id.





[18]Id.





[19]Willey, 360 S.W.2d
at 525.





[20]Boswell v. Brazos
Elec. Power Co-op., Inc., 910 S.W.2d 593, 601 (Tex. App.—Fort Worth 1995,
writ denied); see also Lower Nueces River Water Supply Dist. v. Collins,
357 S.W.2d 449, 452 (Tex. Civ. App.—San Antonio 1962, writ ref’d n.r.e.) (“[W]here
the property condemned is raw acreage it is not proper to admit in evidence
hypothetical plats of nonexistent subdivisions, the reason being that they tend
to cause the jury to value the land as lots.”).





[21]Cannizzo, 267
S.W.2d at 816; see also Sharboneau, 48 S.W.3d at 187 (Baker, J.,
concurring).





[22]Boswell, 910
S.W.2d at 601; see also Collins, 357 S.W.2d at 452 (“Opinion testimony
as to the value must be based upon the value of the land as an entirety and not
in parcels, unless there is some reason to value it in parcels, such as
differences in the nature of the land.”).





[23]Boswell, 910
S.W.2d at 602.





[24]See Heddin v. Delhi
Gas Pipeline Co., 522 S.W.2d 886, 888 (Tex. 1975) (stating that fear of a
proposed pipeline is relevant to a determination of damages in a condemnation
suit when there is a basis in reason or experience for the fear; such fear
enters into the calculation of persons who deal in the buying and selling of
similar property; and there is depreciation of market value because of the
existence of such fear); Stinson v. Arkla Energy Res., 823 S.W.2d 770,
771 (Tex. App.—Texarkana 1992, no writ) (same); see also Hunt, 149 Tex.
at 41, 228 S.W.2d at 156 (noting that  the supposition that market value might
be adversely affected by the existence of the pipeline is not unreasonable).





[25]State v. Ledrec, Inc.,
366 S.W.3d 305, 311 (Tex. App.—Fort Worth 2012, no pet.).





[26]State v. Carpenter,
126 Tex. 604, 615, 89 S.W.2d 194, 200 (1936) disapproved of in part on other
grounds by State v. Meyer, 403 S.W.2d 366 (Tex. 1966).





[27]Id.; see also
Gulf Coast Irrigation Co. v. Gary, 118 Tex. 469, 480, 14 S.W.2d 266, 271
(1929) (“[W]hen the whole of the tract is not taken, . . . the kind and character
of easement condemned, and the manner in which the rights of the condemnor are
to be exercised and maintained, and the rights and privileges left in the
owner, may properly be taken into consideration in assessing the damages.”).





[28]See Sharboneau, 48
S.W.3d at 183 (“Because Mrs. Sharboneau did not offer evidence of individual
lot sales as comparable to her own undivided property, [her expert’s] testimony
is not precluded by Willey and Cannizzo.”).





[29]State v. Delaney,
197 S.W.3d 297, 300 (Tex. 2006) (citation omitted).





[30]Id. at 298–99.





[31]Id. at 298 (citing
County of Bexar v. Santikos, 144 S.W.3d 455, 460–61 (Tex. 2004)).





[32]State v. Dawmar
Partners, Ltd., 267 S.W.3d 875, 880 (Tex. 2008).





[33]Carpenter, 89
S.W.2d at 200.





[34]Dawmar Partners,
267 S.W.3d at 879.





[35]Id. at 880.





[36]Carpenter, 89
S.W.2d at 200.





[37]Id.; see also
State v. Windham, 837 S.W.2d 73, 77 (Tex. 1992) (“In deciding market value
the jury is permitted to consider all of the uses to which the property is
reasonably adaptable and for which it is, or in all reasonable probability will
become, available within the foreseeable future.”).





[38]Carpenter, 89
S.W.2d at 200.





[39]Cannizzo, 267
S.W.2d at 816.





[40]See In re State,
355 S.W.3d 611, 616 (Tex. 2011) (discussing Willey and Cannizzo)
(orig. proceeding) (emphasis added).





[41]See Carpenter, 89
S.W.2d at 200.





[42]State v. Bristol Hotel
Asset Co., 293 S.W.3d 170, 174 (Tex. 2009) (quoting State v. Wood Oil
Distrib., Inc., 751 S.W.2d 863, 865 (Tex. 1988)).





[43]Tex. Elec. Serv. Co.
v. Wheeler, 551 S.W.2d 341, 342–43 (Tex. 1977).





[44]See, e.g., Ford
Motor Co. v. Ledesma, 242 S.W.3d 32, 38–39 (Tex. 2007) (stating that an
expert’s testimony must have a reliable foundation to be admissible); Mack
Trucks, Inc. v. Tamez, 206 S.W.3d 572, 579 (Tex. 2006) (“In determining
reliability, the trial court ‘should undertake a rigorous examination of the
facts on which the expert relies.’”) (citation omitted).





[45]McKinney Indep. Sch.
Dist. v. Carlisle Grace, Ltd., 222 S.W.3d 878, 882 (Tex. App.—Dallas 2007,
pet. denied).





[46]See 2 R.R. 134-35,
138; 4 R.R. 220, 248-51.  The language from Wickliffe’s testimony that Crosstex
quotes in its brief that Cross’s analysis “was part of what made up [her]
opinion” was in answer to a question from Crosstex about her opinions formed in
other cases, not this one.  See 4 R.R. 250.





[47]See Ledrec,
366 S.W.3d at 311 (holding that an expert’s testimony was not based on a
speculative or remote possibility—specifically, what value the property would
have in the future at the time of a future annexation—but instead was based on
an assessment of the current value a willing buyer and seller would
place on the remainder property as of the date of taking because of the
perception that annexation could limit the property’s use); see also Interstate
Northborough P’ship v. State, 66 S.W.3d 213, 221 (Tex. 2001) (discussing State
v. Schmidt, 867 S.W.2d 769 (Tex. 1993), and holding that the
condemnee’s complaint about how the condemnor’s use of the condemned property
affected the remainder property gave rise to compensable damages).





[48]Cannizzo, 267 S.W.2d
at 815.





[49]Id. (emphasis
added).





[50]See id. at 814 (“When[,]
however[,] a particular use of property is prohibited or restricted by law, but
there is a reasonable probability that the prohibition or restriction will be
modified or removed in the near future, the effect of such probability upon
the value of the property may be taken into consideration.” (emphasis
added)).





[51]Dawmar Partners,
267 S.W.3d at 880.





[52]Id. at 879.





[53]Id.





[54]Zwahr, 88 S.W.3d at
628 (“The existing use of the land, in this case, cotton farming, is its
presumed highest and best use, but the landowner can rebut this presumption by
showing a reasonable probability that when the taking occurred, the property
was adaptable and needed or would likely be needed in the near future for
another use.”).





[55]Cannizzo, 267
S.W.2d at 814 (stating that uses may be considered even if that use on the
property is restricted by law when there is “a reasonable probability that the
prohibition or restriction will be modified or removed in the near future”).





[56]See, e.g.,
Windham, 837 S.W.2d at 77 (stating that “[i]n deciding market value the
jury is permitted to consider all of the uses to which the property is
reasonably adaptable and for which it is, or in all reasonable probability will
become, available within the foreseeable future” (emphasis added)); Cannizzo,
267 S.W.2d at 815, stating that “if it appears reasonably probable to the trial
judge that the wants and needs of the particular community may result, within a
reasonable time, in the lifting of restrictions, he should admit
testimony of present value based on prospective use of the property for
purposes not then available” (emphasis added)).





[57]Schneider Nat’l
Carriers, Inc. v. Bates, 147 S.W.3d 264, 277 (Tex. 2004) (noting also that
market values usually reflect expectations about future years “but not future
centuries”).





[58]In her report, Wickliffe
sometimes describes Copper Canyon as a town and sometimes as a city.





[59]In her report, Wickliffe
stated that Copper Canyon describes PD-1 zoning as a “district that is to
provide for a variety of land uses in a human-scaled and pedestrian-friendly
public environment.  These uses include retail and office.”





[60]See Cannizzo, 267
S.W.2d at 815; Carlisle Grace, Ltd., 222 S.W.3d at 884–85 (describing
the basis for an expert’s testimony about the feasibility of residential
development for the property, which included testimony that the city’s
comprehensive plan for the property showed future land use of the property as
low density residential).





[61]See Carlisle Grace,
Ltd., 222 S.W.3d at 884–85 (stating that “the law does not require Carlisle
Grace to show that the use had already been approved” and noting that “that the
City’s comprehensive plan for the property showed future land use of the
property as low density residential,” the same highest and best use determined
by the appraiser).





[62]See City of Keller,
168 S.W.3d at 819 (stating that jurors are the sole judges of the credibility
of the witnesses and may choose to believe one witness and disbelieve another).





[63]No. 02-11-00037CV, 2012
WL 5258695, at *12 (Tex. App.—Fort Worth October 25, 2012, no pet. h.) (mem.
op.).





[64]Id. at *12–13.





[65]Sharboneau, 48
S.W.3d at 182.





[66]See id.





[67]Id.





[68]This approach should not
be confused with another appraisal technique, also apparently referred to as a paired
sale analysis, in which two sales of the same property are compared:  “A paired
sales analysis compares the selling price of the same property at two or more
dates of sale.  If available, the paired sales analysis will measure the
accuracy of an opined adjustment for appreciation or depreciation in the
market.”  James D. Masterman, The Three Approaches To Value, Eminent
Domain and Land Valuation Litigation, SG059 ALI-ABA 377, 381 (2002).





[69]Brandee L. Caswell, A
Primer and Update on Damage Claims Based on Fear and Stigma:  There Is A Lot to
Learn from the Fear and Loathing in San Bruno, Prac. Real Est. Law., May
2012, at 21, 26.





[70]See Sharboneau, 48
S.W.3d at 183 (“The proper inquiry is not whether Patterson made any use of
sales that were dissimilar to the condemned property; it is whether Patterson’s
appraisal method as a whole was relevant and reliable evidence of market
value.”).





[71]Tex. R. App. P. 44.1(a); Romero
v. KPH Consolidation, Inc., 166 S.W.3d 212, 225 (Tex. 2005) (stating that
to obtain reversal of a judgment based upon an error in the trial court, the
appellant must show that the error occurred and that it probably caused
rendition of an improper judgment or probably prevented the appellant from
properly presenting the case to this court).





[72]See Hunt, 228
S.W.2d at 156 (holding that an assumption that a pipeline may affect a property’s
market value “is hardly less reasonable” than a supposition “that an electric
power line across a tract may reduce its market value by reason of interference
with radio reception of future dwellers on the tract”).





[73]See Collin County v.
Hixon Family P’ship, Ltd., 365 S.W.3d 860, 873 (Tex. App.—Dallas 2012, pet.
denied).





[74]Sharboneau, 48
S.W.3d at 182 (stating that a comparison is too attenuated when the appraiser
and the fact-finder cannot make valid adjustments for differences between the
compared properties).





[75]Hunt, 228 S.W.2d at
156 (“Of the various and evidently qualified witnesses who testified in this
case to a substantial depreciation in market value we cannot say that every
reason given in support of these opinions was invalid at law so as to render
all the testimony a nullity.”)





[76]See City of Texarkana
v. Kitty Wells, Inc., 539 S.W.2d 205, 207 n.2 (Tex. Civ. App.—Texarkana
1976, no writ).





[77]843 S.W.2d 448, 457 (Tex.
1992) (holding that the three jury questions required under Carpenter
for partial takings cases “should be reduced to two questions:  first, the
market value of the part taken, considered as severed land, and second, damages
to the remainder, accompanied by an instruction that such damages should be
determined by considering the difference between the remainder’s pre-and
post-taking value”).





[78]Id.





[79]Tex. R. App. P. 44.1(a); Romero,
166 S.W.3d at 225.